In the

# United States Court of Appeals
### For the Seventh Circuit

No. 12-1329

MCKENZIE MORROW,

*Plaintiff-Appellant,*

*v.*

EDWARD J. MAY, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 C 7008 — **Charles P. Kocoras**, *Judge.*

ARGUED SEPTEMBER 26, 2013 — DECIDED NOVEMBER 8, 2013

Before POSNER, MANION, and KANNE, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff sues under 42 U.S.C. § 1983, charging four Chicago police officers—May, Carroll, Town, and Pickett—with unlawful search (primarily a strip search), unlawful seizure (primarily a false arrest), and conspiracy, all in violation of the Fourth Amendment (made applicable to state action by interpretation of the due process clause of the Fourteenth Amendment), and adding a supplemental state law claim against the same defendants, plus

the City of Chicago, charging malicious prosecution. The case was tried to a jury, which returned a verdict exonerating all the defendants. The plaintiff asks us to reverse and order a new trial because of procedural errors that he contends the district judge committed.

From the evidence admitted at trial a reasonable jury could have found the following facts. On the evening (a cold one) of November 7, 2007, the defendant officers—white men in plain clothes, riding in an unmarked car—were driving around Chicago's Humboldt Park neighborhood, a high-crime area that is largely nonwhite, under orders to look for crime. A woman—who officer May, who was driving, testified may have recognized him as a police officer (he was driving a Ford Crown Victoria, the quintessential unmarked police car)—signaled the car to stop and when it did told May that several men were gathered in a vacant lot nearby and one of them, who was wearing a white jacket, was selling "rocks" (crack cocaine). She indicated where the lot was. The officers drove past it and saw a juvenile and three men there. One was the plaintiff, Morrow, age 20, wearing what appeared to be a white jacket. May parked a block or two from the lot, got out, and walked through several yards to a vacant lot just across the street from the lot occupied by the four suspects. From this vantage point ("observation post" in police-speak) he watched the "set" (a drug-selling operation) through a pair of binoculars. The three officers with him remained in the car.

Although it was dark, street lights made the group visible to May and he saw Morrow selling drugs and the juvenile (who turned out to be Lavontay Bell, age 14) collecting the proceeds of the sales from the customers—passersby at-

tracted by the yells of "rocks, rocks" emanating from the two older men in the group. It is common in drug dealing for one member of the dealer group, in this case Morrow, to remove the drugs (the "product," dealers call it) from a stash (savvy dealers avoid carrying the drugs on their persons; the drugs were in a vial on the ground in the vacant lot) and hand them to the buyer; for another member, Bell in this case, to take the money from the buyer; and for the other members (in this case a third and a fourth) to attract potential customers and also prevent them from stealing the drugs or the money. So Morrow was the actual seller and Bell the "banker" and the others were the "steerers," probably doubling as "muscle," given the youth of Morrow and especially Bell.

After about 20 minutes of watching the "set" and counting three sales, May radioed the other officers and told them to arrest the group, which they promptly did. May picked up the vial. Although the lab report calls its content just "cocaine," it was doubtless crack, given the sellers' yells of "rocks, rocks."

At the police station the four arrested drug dealers were searched, but not strip searched. Bell was discovered to have $100 on him. All four arrested persons were charged, but for a variety of reasons the charges against all of them were quashed.

The charge against Morrow was felony possession of an illegal drug. The decision to charge him came in a bond hearing that lasted no more than a minute or two. After leafing rapidly through the police report of Morrow's arrest, the judge ruled that there was probable cause to detain him for a preliminary hearing to determine whether he could be

prosecuted. Unable to make bond, Morrow was jailed to
await the hearing, scheduled for November 29, three weeks
after the arrests. Officer May was notified to appear at the
hearing, but didn't, maybe because of a competing court ap-
pearance, though this was not proved. Because May was ab-
sent the state asked for and received a continuance. The
hearing was rescheduled for December 6. May missed that
hearing too, because he had been subpoenaed to appear that
day at two trials. The prosecutor's office has only 30 days
after an arrest within which to present a felony case to a
judge at a preliminary hearing for a ruling on whether there
is probable cause to prosecute. 725 ILCS 5/109-3.1(b). As of
the sixth of December, 29 days had passed since Morrow's
arrest. It was too late to reschedule the hearing for the next
day, and so the charge was dropped.

At trial Morrow's lawyer argued that officer May had
made up the story about a woman's recognizing him as a
cop and directing him to a vacant lot where crack was being
sold, and that a 60-year-old white man (actually May was
56) would not have dared to conduct surveillance alone in a
black and Hispanic neighborhood, at night, with the tem-
perature in the 30s. In the words of the plaintiff's lawyer,
"This story [that Morrow was arrested as part of a drug
bust] portrayed at best the reckless actions of an older patrol
officer aspiring late in his career to become a narcotics offi-
cer." Not only did the lawyer get May's age wrong; there
was no evidence that May wanted to join the drug squad.
The suggestion that a person in his fifties is too decrepit to
conduct surveillance on a cold night by himself is silly, espe-
cially since the other three officers were only a block away
from where May was peering at the (no longer vacant) lot

through his binoculars and he was in radio contact with them.

Before trial Morrow's lawyer had moved the judge to bar any "questions, argument, and innuendo regarding gang af- filiation and tattoos," and the motion had been granted. Yet at the trial Morrow's lawyer—not the government's law- yer—asked May: "Drugs are sold by gang members pre- dominantly?" May replied: "Not all the time; no, ma'am." The lawyer's question was harmful to her client, and the of- ficer's answer helpful to him. A further perverse inquiry along the same lines by the lawyer's co-counsel of officer Town, asking "Did you ever come to learn that any particu- lar gang controlled drug activity in that area?" (the area in which Morrow was arrested), elicited the reply: "There are numerous amounts of gangs in the Eleventh District." The lawyer pressed Town, asking whether the Four Corner Hus- tlers was one of them and whether "it is a very dangerous gang?" Town replied that the Four Corner Hustlers was in- deed one of the gangs in the area but that "they are all [that is, all the gangs in the district] dangerous, sir."

The questioning was intended to bolster Morrow's weak claim that an old white guy wouldn't have dared to conduct surveillance all by himself at night in a neighborhood where gangs roam. But the questions and the officers' answers ac- tually hurt Morrow's case by bolstering the probability that there was indeed drug dealing when Morrow was arrested, rather than the drug dealing having been a fabrication by the officers, as he claimed.

Morrow testified. He had to, to have any chance of pre- vailing, but by testifying he opened himself to impeachment by his two previous felony convictions, one for possession of

an illegal drug with intent to deliver it and the other for the unauthorized use of a weapon.

He testified that on the evening of the arrest he had decided to buy a "loose square," which means a single cigarette rather than a pack of cigarettes, from a man who lived in the house that, as it happens, abuts the vacant lot where Morrow was arrested. His testimony about the cigarette purchase was a tissue of contradictions and improbabilities. He testified that he had bought loose squares from the man who lived in the house adjoining the vacant lot several times, having stated in his deposition that he had done so only once. He testified that the seller was sitting on his porch, and that though there was no porch light Morrow could see him when he was four or five houses away because the man was light-skinned. No occupant of the house, either at the time of the arrest or the time of the trial, was identified by the plaintiff, let alone called as a witness. Morrow testified that 30 to 45 minutes had passed between when he left his home and when he was arrested, but on cross-examination he changed the estimate to 5 to 6 minutes. We could multiply these examples.

He testified that he was wearing a dark sweater, not a white one, on the night in question. His mug shot shows him wearing two white shirts, but he testified that he had taken off his sweater for the photo because the photographer told him to. He testified that he was strip searched at the police station by officers Carroll and Pickett and that the search may have taken as long as 13 minutes. At his deposition he had said that one of the officers was blond; neither is. Having told his lawyer before trial that he had been strip

searched in the presence of the three persons arrested with him, at trial he recanted.

Lavontay Bell, the juvenile in the drug bust, testified for Morrow. He said he'd had no contact with him since their arrests together. He testified that it had been his first arrest, implying that there had been a later one or ones, as indeed there had been, though the judge kept this from the jury until Morrow's lawyer opened the door by asking Bell whether he had ever been arrested for, or charged with anything more serious than, a traffic offense. He said no, but on cross-examination admitted that he had been arrested at least once since his first arrest. The arrest had involved driving, but was not a traffic stop; it was an arrest pursuant to a warrant.

Bell denied having been involved in a drug sale in the vacant lot. He testified that his mother had given him the $100 found on him when he was arrested for getting good grades (no school record was placed in evidence, however) and that she had told him to call his uncle to get an additional $50 so that he could buy an Xbox 360 (which in 2007 retailed for at least $279, though Bell claimed to have known of a used one for sale, and it might have been priced as low as $150). He testified that his uncle had agreed to meet him near the vacant lot (presumably to give him the $50), and that when he arrived there he saw his uncle talking to a man on the porch of the house from which loose squares are sold and that Morrow arrived a few minutes later, wearing a dark sweater, and asked the man for a cigarette. The uncle, Lee Floyd, was one of the men arrested. He was a big-time drug dealer, later killed in a gunfight after having become second in command to Dana Bostic, the leader of a major Chicago drug gang and coincidentally a defendant in a criminal case

that we heard the same day that we heard this case. See Mick Dumke, "Anatomy of a Heroin Ring," *Chicago Reader*, Feb. 14, 2013, www.chicagoreader.com/chicago/gang-violence-heroin-new-breeds-vice-lords/Content?oid=8761736 (visited Nov. 8, 2013). It's not remotely believable that Floyd was present in the vacant lot for purposes unrelated to drugs.

Bell further testified that after being arrested he was strip searched and that the police took the $100 that was on him and never returned it. This undermined the plaintiff's conjecture that Bell had met his uncle at the vacant lot in order to receive $50; he should have had $150 on him when he was arrested.

The evidence that we have summarized was ample to justify the verdict exonerating the defendants. The idea that May enlisted the three officers with him to fabricate a drug bust so that he could be appointed to the narcotics squad is far fetched. Undoubtedly there had been a drug bust and probable cause to believe that Morrow was the actual seller of the drugs.

Morrow argues that the jury would have decided in his favor had it not been for erroneous rulings by the district judge. The ruling he most emphasizes was allowing the admission of photos that the defendants' counsel discovered on Bell's Facebook page. The photos, which we append to this opinion, show Bell and family members and friends making hand signals, Bell and one other person holding guns, a child holding a beer bottle. The judge allowed the defendants to place the photos in evidence in an effort to link Bell, who was the plaintiff's main witness (other than the plaintiff himself), to gang activity, bolstering the officers'

testimony that they had indeed arrested Morrow and Bell in a drug bust. Morrow argues that the photos were irrelevant and inflammatory. Yet Morrow's lawyers had been the first to inject the issue of gangs into the case by their questioning of officers May and Town. Remember that counsel elicited from the two officers "admissions" that the neighborhood in which the bust occurred was a site of drug gang activity (to show that old man May wouldn't have dared conduct surveillance by himself), and the defendants wanted to reply: "right you are—and Morrow and Bell are among the drug gangsters active in the neighborhood in which they were arrested—just look at Bell's Facebook page."

So this is an example of "invited error"—consistent with the adage that turnabout is fair play. The assertion in the plaintiff's reply brief that "possible gang membership was not even minimally relevant in this case" is inconsistent with his lawyer's insistence at trial that drug gangs were active in the neighborhood in which the arrests took place. The only defensible objection to placing the photographs in evidence (besides their distance in time—three or four years—from the events at issue in the case, but no such objection was made) is that they were inflammatory. We have our doubts. The photos show young people having a good time. There are strange hand signals, a couple of guns, and the beer bottle held by a child, but no drugs, violence, blood, or even signs of anger. We don't know what the all-white jury made of them. Bell denied that the gun he is shown holding in one photo was a real gun, denied that the hand signals were gang signs, denied in short that he has anything to do with gangs. There was no contrary evidence.

The defendants—we're not sure why—don't defend the admission of the photographs (though neither do they, as the plaintiff mistakenly insists in his reply brief, "concede that it was an abuse of discretion for the court to allow the photographs into evidence"), but argue only that any error in admitting them was harmless. We agree. Morrow's case rested entirely on the highly implausible proposition, supported by two extremely unreliable witnesses (him and Bell), that the police fabricated the drug bust—simply arrested four persons at random, one of them only 14 years old, because officer May wanted to be reassigned from patrol duty to the narcotics squad, though no evidence was presented that he wanted that, that he wouldn't have had to do surveillance as a narcotics officer, that he was too timid or decrepit to do surveillance, that assignment as a narcotics officer would have paid more, that it would have been a safer job, that he was a drug addict himself, or that he was a rogue officer and would have shaken down drug dealers had he been rewarded for the drug bust that snagged Morrow by being made a narcotics officer.

The plaintiff also complains about the district court's excluding from the trial *his* photographs, six in number, also appended to this opinion. Photos 1 and 5 show the vacant lot and adjacent house of the alleged loose-square seller, the first from nearby, the second from perhaps a block away. The intermediate photos are of the neighborhood and include partial shots of the vacant lot and adjacent house yet add nothing to the much clearer first and fifth photos. The sixth photo is an unintelligible aerial shot. The judge excluded all six photos on the ground that they were taken during daytime, whereas the arrests took place after dark. We don't understand that ground of exclusion. The plain-

tiff's purpose in wanting the jury to see the photos was to suggest that May couldn't have seen a drug sale from where he was conducting surveillance. The photos, having been taken in daylight, made it seem easier for him to have observed a drug sale than it would have been at the time of the surveillance, which was after dark, when the vacant lot and the adjacent house were illuminated only by a street light and maybe a porch light.

We can't see what photos 2 through 4 added to photo 1, and we can't make any sense of photo 6. But photo 1, the close-up of the vacant lot and adjacent house, would have helped the jury understand the case and should have been admitted. Yet it would have helped the defendants rather than the plaintiff, by showing that the vacant lot was quite small and therefore easily observed in its entirety through binoculars. Any error in excluding it thus was harmless.

Photo 5, showing the vacant lot from about a block away, is the only photo that could have helped the plaintiff if placed in evidence. But it properly was excluded because a car in the picture, obviously not there on the night of the arrest four years previously, obscures the vacant lot. And the vacant lot's distance is deceptive because May's binoculars would have shortened the distance considerably, though by how much we don't know because the power of the binoculars is not in the record.

The plaintiff alleges two other trial errors. One is the judge's refusal to allow Morrow's counsel, in examining officer Carroll, to impeach him with evidence that an internal police investigation had concluded that accusations of his having miscounted some drug evidence (unrelated to this case) and having used abusive language and profanity

(again unrelated to this case) were "founded" (police-speak for "may be true"). The plaintiff wanted to use this evidence to show that Carroll was not a credible witness. But if mere peccadilloes, which so far as appears are all that the "founded" accusations against Carroll showed—there was no evidence that he was reprimanded or otherwise punished for the incidents—could be used to impeach a witness, trials would be interminable, and only saints would avoid impeachment. See *Hollins v. City of Milwaukee*, 574 F.3d 822, 828–29 (7th Cir. 2009); *Redmond v. Kingston*, 240 F.3d 590, 593 (7th Cir. 2001); George E. Dix et al., *McCormick on Evidence* § 41, pp. 72–73 (Kenneth S. Broun ed., 6th ed. 2006). Anyway Carroll was a secondary witness.

Last the plaintiff complains about the district court's allowing testimony regarding his bond hearing. He had to show that there had been no probable cause to charge him with a drug crime arising from the events of November 7, 2007, and to detain him pending a trial on the charge. The judge presiding at the bond hearing had found probable cause, but only enough probable cause to hold Morrow for a full preliminary hearing within 30 days—the hearing that never took place. The probable cause determination at the bond hearing had been based not on testimony or other evidence but just on the police file, which the judge had merely glanced at.

The plaintiff's lawyers were concerned lest the jury be confused and think the bond hearing had determined that there was probable cause not merely to hold him for a further probable cause hearing but to put him on trial. To dispel any such confusion the judge instructed the jury that

> … probable cause is an issue in this civil complaint. And
> the proceedings before [the bond judge] … are different
> fundamentally than those issues and facts and law that
> you are going to be asked to decide in this case. So, there
> are some comparisons between the two, but they are not
> one and the same. And this [proceeding, i.e., the trial] is far
> more extensive than that proceeding. So, you should un-
> derstand that.

The instruction could have been shorter and clearer; it could just have said "disregard the finding of probable cause by the bond judge. It was not based on evidence. Your job is to decide whether the evidence you've heard in this trial shows that there was probable cause to make the plaintiff stand trial for a drug felony." But even if the instruction that the judge gave was unclear, we can't see how it could have harmed Morrow's case. Testimony had made clear that the bond hearing had been perfunctory, and Morrow's lawyer could have reminded the jury of that in her closing argument.

The plaintiff's final argument is that the jury would not have deliberated for a day and a half, following a trial of only three days (apparently only two days of actual testimony), unless it was a close case. See, e.g., *United States v. Kojayan*, 8 F.3d 1315, 1323–24 (9th Cir. 1993); see also *United States v. Ottersburg*, 76 F.3d 137, 140 (7th Cir. 1996); *United States v. Varoudakis*, 233 F.3d 113, 117–18, 126 (1st Cir. 2000). Had it been a close case (it wasn't), even a minor error might have swung the verdict against him. But a more plausible explanation for the length of the deliberations relative to the brevity of the trial is that determining the liability of five defendants on six claims (some lodged against more than one defendant) was a time-consuming project for a conscientious

jury. Students of the American jury distinguish between two styles of jury deliberation: "verdict-driven," in which the jury votes early on, and "evidence-driven," in which the jury discusses the evidence before taking a vote. See Reid Hastie, Steven D. Penrod & Nancy Pennington, *Inside the Jury* 148, 163–65 (1983). Evidence-driven juries take longer to reach their verdicts. *Id*. at 165; see also Shari Seidman Diamond, "Truth, Justice, and the Jury," 26 *Harv. J.L. & Pub. Pol'y* 143, 152–53 (2003). The jury in this case may well have been evidence-driven and taken its time weighing the competing contradictory testimony and pondering the hand-signal photos.

AFFIRMED.

APPENDIX 1: DEFENDANTS' PHOTOS













APPENDIX 2: PLAINTIFF'S PHOTOS



Photo 1



Photo 2



Photo 3



Photo 4



Photo 5



Photo 6