In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3967

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JADWIGA MALEWICKA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 424— **Elaine E. Bucklo**, *Judge.*

ARGUED SEPTEMBER 27, 2011—DECIDED DECEMBER 29, 2011

Before FLAUM, KANNE, and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge.* This appeal follows Jadwiga Malewicka's conviction for structuring transactions to avoid reporting requirements in violation of 31 U.S.C. § 5324(a)(3). Malewicka raises two issues on appeal. First, she argues that the amount she is required to forfeit, $279,500.00, is excessive in violation of the Eighth Amendment. Next, she argues that the ostrich instruction given at trial was improper. For the reasons set forth below, we affirm.

## I.  Background

### A.  Factual Background

Malewicka emigrated to the United States from Poland in 1986 at the age of 26. Upon her arrival, she began supporting herself by cleaning houses, eventually forming her own cleaning service business in 1992, Skokie Maid Service ("Skokie Maid"). In conjunction with the start of her business, she also opened a business checking account at Liberty Bank to conduct Skokie Maid's services. Malewicka used a separate checking account for her personal funds.

Skokie Maid's customers generally paid by checks made out to Skokie Maid. Malewicka would deposit the checks in Skokie Maid's checking account, keep a portion of the funds as a fee, and then withdraw the remaining amount to pay individual cleaners.

In February 2006, Malewicka was approached by a bank teller, Ada Ventura. Ventura approached her because she thought Malewicka had withdrawn more than $10,000 in cash. Under 31 C.F.R. § 103.22(b)(1) the bank is required to document and report all transactions involving withdrawals of cash greater than $10,000. Ventura testified that she provided Malewicka with a brochure that explained this requirement. Malewicka denied Ventura's account of this encounter, asserting that no brochure was provided and that there was no discussion of the bank's § 103.22 obligations.

Following the encounter between Malewicka and Ventura, Malewicka continued banking at Liberty Bank. Often, she would withdraw approximately $9,900 on

one day, and the following day withdraw approximately $2,000. Malewicka never withdrew $10,000 or more on one day. On numerous occasions, however, she with-drew more than $10,000 over the course of two days (but less than 24 hours). An analysis of bank records revealed that between January of 2002 and April of 2008, Malewicka's withdrawals of approximately $9,900 totaled over $2.4 million. During this period, Malewicka withdrew amounts over $9,000 and less than $10,000 on 244 occasions.

### B. Procedural History

On May 28, 2008, the Grand Jury returned an indict-ment against Malewicka for 23 counts of structuring transactions for the purpose of avoiding bank reporting requirements in violation of 31 U.S.C. § 5324(a)(3). The government took the case to trial, but the initial prosecu-tion resulted in a mistrial. Malewicka was retried on March 22-23, 2010.

The government proposed an "ostrich" instruction which provided that:

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important fact yet shut her eyes for fear of what he/she would learn, you may conclude that he/she acted knowingly as I have used that term.

The district court gave this instruction over Malewicka's objection. The jury found Malewicka guilty on all 23

counts. Then, the jury was asked to determine whether the amount of money alleged in the indictment to have been used in connection with the structuring offenses—$279,500—was subject to forfeiture. The jury returned a special verdict in favor of the government subjecting the entire $279,500 to forfeiture.

Malewicka filed post-trial motions to set aside verdicts and enter judgment of acquittal and/or for a new trial. Her motions argued that the forfeiture verdict constituted an excessive fine in violation of the Eighth Amendment. Malewicka also reiterated her objection to the ostrich instruction. The district court denied Malewicka's post-trial motions in their entirety.

Malewicka was sentenced on December 16, 2010. The court recognized that she had no criminal history, had employed many people, "raised a couple of children and . . . made other contributions to the community." The court sentenced Malewicka to three years of probation and ordered her to pay a forfeiture amount of $279,500, as well as an additional judgment of $4,800.

Pursuant to 31 U.S.C. § 5317(c), the court imposing sentence shall order the forfeiture of all property involved in the offense, and any property traceable thereto.

## II. Discussion

### A. The Forfeiture

We review the constitutionality of the district court's forfeiture amount de novo. *United States v. Segal*, 495 F.3d 826, 840 (7th Cir. 2007). Malewicka argues that

*United States v. Bajakajian* forms a basis for the reduction of her forfeiture amount. 524 U.S. 321 (1998). Pointing to the factual similarities between the two cases, she contends that the imposition of a forfeiture in the amount of $279,500 was grossly disproportionate to the offense for which she was convicted. Though we acknowledge that the forfeiture amount is significant, we do not find it so grossly disproportionate to her offense as to violate the Eighth Amendment.

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. CONST. amend. VIII. It is well recognized that the Eighth Amendment's limitations apply where a judgment of forfeiture has been entered against a criminal defendant in connection with the conviction of a federal offense. *Bajakajian*, 524 U.S. at 328. When assessing whether a judgment exceeds the bounds of the Eighth Amendment's limitations, "the touchstone of the constitutional inquiry . . . is the principle of proportionality: the amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at 334. In determining proportionality for punitive forfeiture, a court "must compare the amount of the forfeiture to the gravity of the defendant's offense. If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional." *Id.* at 336-37.

In *Bajakajian*, the defendant was arrested in Los Angeles International Airport while attempting to board a flight to Italy with $357,144 in undeclared cash hidden in his,

and his family members', luggage. *Bajakajian*, 524 U.S. at 324-25. He was charged with one count of wilfully failing to report that he was transporting more than $10,000 outside the United States, one count of making a false material statement to the United States Customs Service, and a third count which sought forfeiture of the $357,144. *Id*. at 325. The defendant pled guilty to the first charge, the second charge was dismissed, and a bench trial was held regarding the forfeiture allegation. *Id*. At the conclusion of the bench trial, the district court acknowledged that the entire sum involved in the offense was subject to forfeiture. *Id*. at 326. However, because of the disproportionality between the crime and the requested forfeiture amount of $357,144, the district court ordered that defendant forfeit only $15,000. Both the Ninth Circuit and the Supreme Court affirmed.

The Supreme Court considered four factors when determining whether the forfeiture was excessive: (1) the essence of the crime and its relation to other criminal activity; (2) whether the defendant fit into the class of persons for whom the statute was principally designed; (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the defendant's conduct. *Bajakajian*, 524 U.S. at 337-39; *United States v. Varrone*, 554 F.3d 327, 331 (7th Cir. 2009). Considering these factors, the Court found that forfeiture of the entire amount would have been unconstitutional. Applying these factors here, we do not find a Constitutional violation.

The first factor considered by the Supreme Court in *Bajakajian* was the essence of the crime and its relation to other criminal activity. Looking at the essence of the crime, in *Bajakajian*, the Court noted that the defendant's conviction was solely a reporting offense. *Id*. at 337. Moreover, Bajakajian was only found guilty of one offense. This differs from the case at hand. Though Appellant argues that her crime too was a simple reporting offense, in fact, her crime differs in both quality and quantity. True, Malewicka's underlying activities— depositing and withdrawing cash from the bank—were lawful. However, unlike Bajakajian's reporting failure, Malewicka's crime affected more than just herself and the government; her actions also implicated the bank as an intermediary actor and affected its legal duty to report certain transactions. *United States v. Ahmad*, 213 F.3d 805, 817 (4th Cir. 2000) ("Ahmad's deposit structuring activities not only caused the government to lose information, but also implicated an intermediary actor, the First Virginia Bank, and affected its legal duty to report certain transactions."). Furthermore, while Bajakajian committed a single offense, Malewicka was convicted of actively concealing the nature of her transactions on twenty-three occasions to avoid filing Currency Transaction Reports ("CTR").[1] Her conduct, therefore, was much more extensive than that of Bajakajian and moreover, required significant planning.

---

[1] The evidence showed that Malewicka engaged in a pattern of such conduct that spanned at least six years, though she was only charged with 23 violations between March 3, 2006 and April 26, 2008.

The Supreme Court also looked to motivation and connection to other criminal activity in analyzing the first factor. In *Bajakajian*, the defendant committed his crime out of fear and distrust for the government. *Bajakajian*, 524 U.S. at 326. This fear was rooted in his background (Bajakajian grew up an Armenian minority in Syria). *Id.* The Court noted that while this was no excuse for lying, it explained his failure to report the cash, and helped establish that his reporting failure was unconnected to any other crime—a finding that was "highly relevant to the determination of the gravity" of his offense. *Id*. at 339. Here, there is no evidence that Malewicka's structuring was connected to any other crime, though the district court certainly found this conclusion suspect.[2] Nonetheless, Malewicka provided no reason for her conduct at all; she explained only that she chose withdrawal amounts because they were "just a number" of no significance, or because the numbers reminded her of the *Da Vinci Code*. The district court found Malewicka untruthful, and culpable for her actions, and even guilty of obstruction. Accordingly, while Malewicka's structuring was not connected to other crimes, an important consideration when determining the gravity of the offense, because of the numerous violations of the statute and the prolonged period

---

[2] The district court appeared unconvinced that tax evasion was not the underlying motivation for Malewicka's actions. ("My understanding was really that's mostly what this case is really about . . . I'm not sure why the government didn't prosecute her for the tax cases.").

of time over which they occurred, the first factor weighs in favor of forfeiture of the full amount.

The second factor asks whether the defendant fits into the class of person for whom the statute was principally designed. In *Bajakajian*, the Court noted that the defendant did not fall into this category as the statute, 31 U.S.C. § 5316(a)(1)(A), was designed for the "money launderer, drug trafficker, or tax evader." *Id.* at 338. Instead, Bajakajian declined to report that he was taking in excess of $10,000 out of the country with the purpose of paying a legitimate debt. In contrast, Malewicka was convicted pursuant to § 5324. That section has been described as "a reporting statute intended to facilitate the government's efforts to uncover and prosecute crime and fraud," noting that "[b]y forcing financial institutions to file CTRs, Congress hoped to maximize the information available to federal regulatory and criminal investigators." *United States v. Castello,* 611 F.3d 116, 122 (2d Cir. 2010). "[T]he overall goal of the statute was to interdict the laundering of illegally obtained and untaxed monies in legitimate financial institutions." *Id*. In *Bajakajian*, the defendant did not facilitate any offense that the statute was designed to protect against—instead, he was carrying his own earned money to repay a lawful debt. *Bajakajian*, 524 U.S. at 338. Here, while Malewicka was not charged with wrongdoing in connection with the structured funds, she remains a person for whom the statute was designed. She is an employer who deals mainly in cash. Even if she did not intentionally facilitate tax evasion, she nonetheless prevented the bank from filing CTRs in compliance with

the statute, which frustrated the statute's purpose. *See Castello,* 611 F.3d at 120-24 (defendant was acquitted of money laundering and tax evasion, but the court nonetheless found that he fell into the class of person for whom § 5324 was designed). "By forcing financial institutions to [file CTRs], Congress hoped to maximize the information available to federal regulatory and criminal investigators." *United States v. St. Michael's Credit Union,* 880 F.2d 579, 582 (1st Cir. 1989); *see also Cal. Bankers Ass'n v. Shultz,* 416 U.S. 21, 27 (1974) ("The absence of such records . . . was thought to seriously impair the ability of the Federal Government to enforce the myriad criminal, tax, and regulatory provisions of laws which Congress had enacted."); *but cf. United States v. Ramirez*, 421 Fed. Appx. 950, 952 (11th Cir. 2011) (analogizing structuring offense to reporting offense). True, Malewicka is not convicted of money laundering or tax evasion, but her structuring crimes could have facilitated such conduct in just the way the statute was designed to frustrate. *Castello*, 611 F.3d at 123. Accordingly, the second factor weighs in favor of forfeiture of the full amount.

The third factor considers the maximum fine and sentence that could have been imposed. In *Bajakajian*, the Court focused on the Sentencing Guidelines, but noted that "other penalties that the Legislature has authorized are certainly relevant evidence." *Bajakajian*, 524 U.S. at 339 n. 14. "[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Id*. at 336.

Comparing Bajakajian's maximum Sentencing Guidelines fine of $5,000 with the statutory maximum which consisted of a maximum fine of $250,000 and a term of imprisonment of five years, the Court explained that the disparity between the two ranges "undercut[] any argument based solely on the statute, because they show that respondent's culpability relative to other potential violators of the reporting provision—tax evaders, drug kingpins, or money launderers, for example—is small indeed." *Id*.

It is not a simple task to translate the gravity of a crime into monetary terms. Two bodies, however, have undertaken this charge. The first is Congress which has specified through criminal laws the maximum permissible fine for a given offense. *United States v. 817 N.E. 29th Drive Wilton Manors*, 175 F.3d 1304, 1309 (11th Cir. 1999). The second body to offer guidance is the United States Sentencing Commission. This judicial agency puts forth guidelines designed to proportion punishment with greater precision than criminal legislation. *Id*. at 1310; *Bajakajian*, 524 U.S. at 350 (Kennedy, J., dissenting). There is a strong presumption of constitutionality where the value of a forfeiture falls within the fine range prescribed by Congress or the Guidelines. *817 N.E. 29th Drive Wilton Manors*, 175 F.3d at 1309-10. These pronouncements reflect the considered legislative judgment as to what is excessive, and a court should be hesitant to substitute its opinion for that of the people. *Id*. at 1309.

Here, much like *Bajakajian*, the discrepancy between the two penalties is great. Under statute, Bajakajian

faced a maximum term of imprisonment of five years, a maximum fine of $250,000, or both. His Guidelines recommendation, however, was substantially lower— a term of imprisonment not more than six months, a maximum fine of $5,000, or both. *Bajakajian*, 524 U.S. at 339. Pursuant to statute, Malewicka faced no more than five years in prison, a maximum statutory penalty of $250,000, or both; because Malewicka was convicted of twenty-three separate violations, the possible penalty totaled $5,750,000. 31 C.F.R. § 103.59. On the other hand, under the Guidelines Malewicka faced a period of incarceration of zero to six months, and a maximum fine of $10,000. There is an obvious disparity between the Guidelines maximum and the statutory maximum, and *Bajakajian* suggests that this reflects the relative culpability of Malewicka as compared to other violators.

For multiple reasons, we do not believe that the penalties here "confirm a minimal level of culpability" as they did in *Bajakajian*. Unlike Bajakajian, Malewicka is not a one-time offender and in fact committed numerous violations over an extended period of time.[3]

_____

[3] Relying on *United States v. Ramirez,* Malewicka argues that even multiple violations of the anti-structuring statute can result in forfeiture amount in violation of the Eighth Amendment. 421 Fed. Appx. at 952. While this may be true, we do not believe it to be the case here. Ramirez was found guilty of structuring 103 transactions, though his money was not connected to illegal activity, and he made no effort to conceal his actions. *Id*. at 952. The government requested that Ramirez

(continued...)

Additionally, as an employer depositing and withdrawing large sums of cash, she is indeed a person for whom the statute was designed. Furthermore, though the *Bajakajian* Court focused on the Guidelines range, there, the forfeiture of $357,144 exceeded both the maximum statutory fine of $250,000 and the maximum fine under

---

[3] (...continued)

forfeit all of the funds that he was convicted of structuring, $967,100. Considering these facts in light of *Bajakajian*, the *Ramirez* court found that a forfeiture twelve times greater than the sentencing guidelines was excessive. *Id*. Accordingly, it arbitrarily chose to order the defendant to forfeit $1,000 per count, resulting in a total forfeiture amount of $103,000. Brief of United States of America, *Ramirez*, 421 Fed. Appx. 950, at *12. We find *Ramirez* unpersuasive. First, the *Ramirez* analysis is vague on facts. It states that Ramirez did structure transactions to avoid reporting requirements, but did not attempt to conceal his crime, without further explanation, which renders direct comparison difficult. *Ramirez* also minimizes the harm caused by this crime by stating that his structuring was "only" a reporting crime and affected "only" the IRS and bank by depriving them of information. *Ramirez*, 421 Fed. Appx. at 952. *Cf. United States v. Ahmad*, 213 F.3d 805, 817 (4th Cir. 2000) (recognizing the significance of structuring crimes). While this may be true, the judiciary should not lightly discount the severity or impact of crimes proscribed by the legislature. Moreover, we know that Malewicka was exactly the type of person to whom Congress intended the statute to apply. The evidence showed that over a six-year period, Malewicka structured almost $2.5 million. Though her violations were not connected to other crimes, they were certainly well thought out and deliberately executed.

the sentencing guidelines of $5,000. Here, the forfeiture does exceed the maximum Guideline range, but not the statutory range. Finally, the language of both the Guidelines and the statute supports forfeiture. Pursuant to the Guidelines, "[f]orfeiture is to be imposed upon a convicted defendant as provided by statute." U.S.S.G. § 5E1.4. Malewicka was convicted of twenty-three separate violations of § 5324(a)(3). Section 5317(c) governs the imposition of sentence as to any violation of § 5324 and dictates that a district court "shall order the defendant to forfeit all property, real or personal, involved in the offense." Acknowledging the disparity between the Guidelines range and the forfeiture amount, when considering the essence of this crime, this factor does not suggest a constitutional violation.

Finally, the fourth factor examines the nature of the harm caused by the offense. Malewicka argues that the harm caused was minimal, and that if gone undetected, would only have deprived the government of information that she made certain cash withdrawals. While it is true that her acts deprived the government of nothing but information, this characterization greatly downplays the significance of her crime. Malewicka kept information regarding numerous transactions from the government over a period of years. The concerns underlying her crime were significant enough that Congress enacted a statute to ensure that such information is collected, and by concealing her withdrawals, she thwarted the bank's reporting duties. *See Ahmad*, 213 F.3d at 817 ("Ahmad's deposit structuring activities not only

caused the government to lose information, but also implicated an intermediary actor, the First Virginia Bank, and affected its legal duty to report certain transactions."). Moreover, section 5324's intent is to aid the government's efforts to uncover and prosecute crime and fraud. *Castello*, 611 F.3d at 122. By structuring her transactions to avoid reporting requirements, Malewicka inhibited the government's ability to effectively uncover and identify fraud. This factor weighs in favor of forfeiture.

Malewicka goes on to note that the forfeiture is particularly unfair because the funds did not belong to her. This fact, however, does not alter the *Bajakajian* analysis. In *Castello*, the amount of forfeiture was based on the structure proceeds of checks cashed at the defendant's check cashing business. *Castello*, 611 F.3d at 120-124. Similarly, in *Ahmad*, 213 F.3d at 817, the forfeiture amount was based on the amount of structured funds sent on behalf of clients at the defendant's money exchange business. Moreover, the statute specifies only that the forfeiture be based on property involved in the offense. That the funds were not Malewicka's is of no consequence.

Considering all of the factors, we affirm the forfeiture award entered by the district court. In doing so, we recognize that the forfeiture amount is not an insubstantial amount. However, when weighing the forfeiture against the severity of Malewicka's crime, we do not find a constitutional violation.

**B.  The Ostrich Instruction**

We review a decision to give an ostrich instruction for abuse of discretion, viewing all evidence in the light most favorable to the government. *United States v. Severson*, 569 F.3d 683, 689 (7th Cir. 2009). The court evaluates de novo whether the instruction was appropriate as a matter of law. *United States v. Tanner*, 628 F.3d 890, 904 (7th Cir. 2011). Where the court concurs that an instruction was inappropriately given, reversal is warranted unless the government can demonstrate beyond a reasonable doubt that the error was harmless. *United States v. Ciesiolka*, 614 F.3d 347, 354 (7th Cir. 2010).

The so-called ostrich instruction, which instructs the jury that it can consider the defendant's willful ignorance of any fact as actual knowledge of that fact, is to be given "cautiously" and only for "narrow" uses. *Ciesiolka*, 614 F.3d at 352-53. An ostrich instruction is appropriate only "where the actions of the defendant and the surrounding circumstances indicate that the only way the defendant could not have known of the illegal activity is by affirmatively avoiding the knowledge." *United States v. L.E. Myers Co.*, 562 F.3d 845, 854 (7th Cir. 2009) (internal quotation and citation omitted). For an ostrich instruction to be permissible, (1) the defendant must claim lack of guilty knowledge and (2) the government must present evidence that suggests that the defendant deliberately avoided the truth. *Tanner*, 628 F.3d at 904. The ostrich instruction is to inform the jury that under certain circumstances, constructive knowledge when paired with steps to avoid knowledge can

amount to actual knowledge. "[I]f the evidence against the defendant points solely to direct knowledge of the criminal venture, it would be error to give the [ostrich] instruction." *United States v. Caliendo*, 910 F.2d 429, 435 (7th Cir.1990) (internal quotation and citation omitted).

At trial, the government presented evidence of both actual knowledge and deliberate avoidance. The government relied on the testimony of Ada Ventura, a Liberty Bank teller, to support both theories. Ventura testified that on February 24, 2006, she asked Malewicka for a copy of her driver's license while Malewicka was conducting a transaction at the bank. According to Ventura, Malewicka inquired why Ventura needed the license and stated, "Are you going to fill out a report on me? . . . I didn't take more than $10,000 out." Ventura testified that she provided Malewicka with a copy of a "CTR pamphlet" which instructed the reader as to the bank's requirement to report cash transactions in excess of $10,000. Ventura also testified that at Malewicka's urging, she reviewed her transactions, and realized that Malewicka was correct that she had not withdrawn $10,000. At a later date, Malewicka asked Ventura if she had looked into the transaction, and Ventura told her that she had, and indeed Malewicka was correct—she had not withdrawn $10,000. Ventura testified that Malewicka responded that "she knew it—that she was right and she knew what she was doing." Malewicka denied ever saying such things to Ventura and further denied that Ventura provided any brochure or discussed the reporting requirement. Instead, Malewicka testified that Ventura asked her to sign a form before leaving the bank, which she did.

Malewicka argues that the ostrich instruction was inappropriately given because the government failed to offer any evidence, or argument, to show that she had deliberately avoided learning that Liberty Bank was required to report any cash withdrawals involving more than $10,000. Instead, the government put forth evidence of actual knowledge. Accordingly, by the terms of the government's own evidence, an ostrich instruction was unnecessary and inappropriate. The government, though, is not precluded form presenting evidence of both an actual knowledge theory and a conscious avoidance theory, as it did here. *United States v. Carrillo*, 269 F.3d 761, 769 (7th Cir. 2001). As the government's theory goes, if Malewicka was given the pamphlet, and chose to ignore it, she was deliberately bypassing the reporting requirements. Even if Malewicka had some knowledge or suspicion of the CTR requirements before being handed the pamphlet, if after receiving the pamphlet she did not know that the bank was obligated to report cash transactions over $10,000, and that it was illegal to evade reporting by structuring, such a lack of knowledge would be the product of deliberate avoidance. That Malewicka denied ever receiving the pamphlet is of no consequence—the credibility of her testimony is for the jury to decide. It is true that the government put forth no evidence to show that Malewicka deliberately avoided receiving the pamphlet (e.g., that she refused to accept it, or refused to read it), but instead submitted Ventura's testimony to refute Malewicka's denial of ever receiving the pamphlet. If the jury found Ventura credible as to the fact

that she gave Malewicka the pamphlet, it is reason-
able to conclude that Malewicka deliberately avoided
learning about the CTR requirement. Given these facts,
the decision to give the instruction was proper.

Even if the trial court did err in giving the ostrich
instruction, the error was harmless given the evidence
that Malewicka did know of the CTR reporting require-
ments and acted to avoid them. *Tanner*, 628 F.3d at 905
("Ironically, the same evidence that helped establish
the impropriety of the ostrich instruction renders that
instruction entirely harmless." ). The government is not
precluded from presenting evidence of both an actual
knowledge theory and a conscious avoidance theory.
*Carrillo*, 269 F.3d at 769. To sustain a conviction under
§ 5324, the government must allege and prove that the
defendant had knowledge of a bank's federal reporting
requirements and that she acted to avoid them.
*United States v. Van Allen*, 524 F.3d 814, 820 (7th Cir.
2008). The government did just that.

Regarding actual knowledge, bank records show
that Malewicka did not make a single withdrawal of
over $10,000 throughout a six-year period. Between
January 2002 and April 2008, cash was withdrawn in
amounts between $9,000 and $10,000 on 244 occasions.
On near 80 of these occasions, the transaction was
followed by, or preceded by, an additional transaction,
in less than 24 hours, resulting in a total withdrawal
of more than $10,000. This court has found that
repeated transactions below $10,000 are evidence of
intent to structure in violation of § 5324. *See United States*

*v. Cassano*, 372 F.3d 868, 878-79 (7th Cir. 2004), *vacated on other grounds*, 543 U.S. 1109 (2005) (citing *United States v. Booker*, 543 U.S. 220 (2005)). ("[I]it is unlikely, to the point of absurdity, that it was pure coincidence that all fifty-one checks cashed by [defendant] were in denominations under $10,000."). Moreover, Malewicka's comments to Ventura when asked for her driver's license number also support a finding of intentional evasion.

As to the conscious avoidance theory, the government presented evidence that Malewicka chose to remain ignorant to the reporting rules and illegality of evasion. This court has noted that "the danger of giving the instruction where there is evidence of direct knowledge but no evidence of avoidance of knowledge is that the jury could still convict a defendant who merely should have known about the criminal venture." *United States v. Caliendo*, 910 F.2d 429, 435 (7th Cir. 1990) (internal citations and quotations omitted). However, this court has deemed the error harmless where there is evidence that the defendant indeed had the requisite knowledge. *Id.* ("[T]he evidence reveals that Vito Caliendo did know about the conspiracy's illegal purpose and, indeed, went to great lengths to bring about and protect that purpose. For this reason, we conclude that Vito Caliendo was not prejudiced by the ostrich instruction given."). Here, there was sufficient evidence to show that under an actual knowledge theory, Malewicka was guilty of structuring transactions. Accordingly, any error in giving the ostrich instruction was harmless.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.