In the

 United States Court of Appeals
 for the Seventh Circuit
 ____________________
No. 20-2739
SUSAN GRASHOFF,
 Plaintiff-Appellant,
 v.

DAVID J. ADAMS,
Commissioner of the Indiana
Department of Workforce Development,
 Defendant-Appellee.
 ____________________

 Appeal from the United States District Court for the
 Northern District of Indiana, Fort Wayne Division.
 No. 1:19-CV-00276-HAB — Holly A. Brady, Judge.
 ____________________

 ARGUED MAY 13, 2021 — DECIDED APRIL 18, 2023
 ____________________

 Before SYKES, Chief Judge, and SCUDDER and KIRSCH,
Circuit Judges.

 Commissioner David Adams has been substituted for former Commis-
sioner Frederick D. Payne, who resigned from office. See FED. R. APP.
P. 43(c)(2).
2 No. 20-2739

 SYKES, Chief Judge. Indiana provides weekly unemploy-
ment benefits to claimants who meet certain qualifications.
People working part-time jobs qualify, but they must accu-
rately report their income so the Indiana Department of
Workforce Development can reduce the weekly payout
accordingly. A claimant who knowingly fails to disclose
earnings on a weekly application must repay all benefits
received for that week and is subject to a civil penalty of 25%
of that forfeited amount.
 Susan Grashoff violated the reporting requirement by
omitting her part-time income on 24 weekly applications.
After an investigation, the Department determined that she
knowingly violated the law and assessed a forfeiture and
penalty totaling $11,190—the sum of all benefits she received
for each of the 24 weeks, see IND. CODE § 22-4-13-1.1(a), plus
the 25% penalty, see id. § 22-4-13-1.1(b). An administrative
law judge affirmed the sanction, see id. § 22-4-13-1.1(c), and
Grashoff did not seek state judicial review.
 Instead, she filed this federal suit under 42 U.S.C. § 1983
alleging that the sanction violates the Eighth Amendment’s
Excessive Fines Clause. Ruling on cross-motions for sum-
mary judgment, the district court rejected the claim. The
judge first addressed whether the forfeiture of benefits is
properly classified as remedial or punitive. That’s the first
question in all excessive-fines cases: purely remedial sanc-
tions are not subject to Eighth Amendment review. Grashoff
argued that the forfeiture falls on the punitive side of the
line because she remained eligible for some benefits during
the 24-week period despite her part-time income. The judge
rejected that argument and classified the entire forfeiture as
remedial.
No. 20-2739 3

 That left the 25% penalty, which everyone agreed is a
punitive sanction subject to Eighth Amendment scrutiny.
Applying the framework established in United States v.
Bajakajian, 524 U.S. 321 (1998), the judge concluded that a
25% penalty is not grossly disproportionate to the serious-
ness of the reporting offense and thus is not unconstitution-
ally excessive.
 Grashoff challenges both aspects of the decision below.
We don’t need to decide whether the judge correctly drew
the remedial/punitive line. Grashoff concedes that at least
part of the forfeiture—the difference between the benefits
she received and the smaller amount she would have re-
ceived had she reported her income—is purely remedial.
The remaining forfeiture amount, even when considered
together with the 25% penalty, is not a grossly dispropor-
tionate sanction for Grashoff’s 24 knowing violations of the
law.
 Grashoff also contends that the Eighth Amendment in-
quiry must consider the sanctioned person’s ability to pay.
We can leave that legal question for another day. Grashoff
has sufficient assets to pay this civil sanction.
 I. Background
A. Statutory Background
 Indiana’s unemployment compensation system is admin-
istered by the state Department of Workforce Development
and funded primarily by employer contributions. IND. CODE
§§ 22-4-26-1, 22-4-10-1. Unemployed and “partially unem-
ployed” claimants are eligible to receive benefits. Id. §§ 22-4-
3-1 to -2. But income earned from part-time work is
4 No. 20-2739

“[d]eductible income” and reduces the claimant’s benefit
amount in a given week. Id. § 22-4-5-1.
 The Department needs to know a claimant’s exact income
to ensure eligibility for benefits and to calculate the correct
amount of the weekly benefit. When claimants underreport
their income, they receive more money than they should and
undermine the financial integrity of the fund. Indiana law
directs the Department to determine and recover overpay-
ments. Id. § 22-4-13-1.
 The statutory scheme includes a provision addressing a
claimant’s “knowing” failure to disclose income that “would
disqualify the individual for benefits” or “reduce the indi-
vidual’s benefits.” § 22-4-13-1.1(a). 1 A knowing failure
results in two civil consequences. First, the claimant forfeits
“any benefits … that might otherwise be payable to the
individual for any week in which the failure to disclose or
falsification caused benefits to be paid improperly.” Id. In
other words, a knowing failure to report income during a
weekly benefit period leads to the forfeiture of all benefits
paid during that period. This money goes back into the
unemployment fund.
 Second, a knowing failure to report income is subject to a
civil penalty. For a first-time violator, the penalty is 25% of
the “benefit overpayment.” § 22-4-13-1.1(b). The penalty
jumps to 50% for the second violation and to 100% for each
subsequent one. Id. The state deposits most of the money
from these civil penalties into a fund for employment and

1 The Indiana legislature adopted some immaterial amendments to
§ 22-4-13-1.1 while this case has been pending. We use the version that
was in effect at the time Grashoff applied for benefits.
No. 20-2739 5

training services, but 15% goes to the unemployment fund
itself. Id. § 22-4-13-1.1(d). A claimant who knowingly vio-
lates the reporting requirement may also face criminal
penalties. See id. § 22-4-34-4 (class C misdemeanor to know-
ingly violate the statutes concerning the unemployment-
compensation system “except as otherwise provided”); see
also id. § 35-43-5-7(a)(1), (b)(1) (level 6 felony to “knowingly
or intentionally … obtain[] public relief or assistance by
means of … [a] false or misleading oral or written state-
ment … or other fraudulent means” when the “amount of
public relief or assistance involved” is more than $750 but
less than $50,000) (repealed July 1, 2021). 2
B. Grashoff’s Applications for Benefits
 For decades Susan Grashoff worked at McDonald’s, in-
cluding as an assistant manager. Throughout her career she
has also taught swimming lessons at her local YMCA, and
she resumed that part-time work in 2010 to supplement her
income from McDonald’s. In late 2016 she lost her job at
McDonald’s. She applied for and received unemployment
benefits starting in December of that year. She submitted
24 weekly claims from then until May 2017, and the
Department paid her $373 for each of those weeks.
 Grashoff continued to work at the YMCA during this pe-
riod, earning a total of $2,828.75 from swimming lessons. But

2 Though this provision has been repealed, Indiana criminal law still

covers similar conduct. A person who knowingly makes a false or
misleading statement with the intent to obtain a “government[] or
employment benefit to which the person is not entitled” commits a level
6 felony if the “pecuniary loss” is at least $750 but less than $50,000. IND.
CODE § 35-43-5-4(a)(1), (b)(2).
6 No. 20-2739

she never disclosed this income to the Department when she
submitted claims for benefits, so her payments were not
reduced as they should have been. She failed to do so de-
spite repeated warnings and instructions. For example, the
online application includes a notice titled “IMPORTANT
UNEMPLOYMENT INSURANCE INFORMATION,” which
reads in relevant part:
 I understand that I must report all earnings
 from employment or self-employment regard-
 less of source, including … part-time employ-
 ment … .
 ….
 I am aware that if I knowingly make any false
 statements or fail to provide required infor-
 mation, this could be considered as fraudulent
 behavior. If detected, this would require re-
 payment of my unemployment benefits, will
 cause penalty and interest to be added to the
 overpaid amount, … and may lead to civil
 and/or criminal prosecution.
 In addition, the application form requires claimants to
certify that they have “reported any and all work, earnings,
and self-employment activity for th[e] week” and “that all
answers and information given in th[e] application for
benefits are true and accurate.” The online application form
also contains a link to the Claimant Handbook, which claim-
ants are required to read. The Handbook explains that a
claimant “commit[s] fraud” by “[k]nowingly fail[ing] to
report any earnings.”
No. 20-2739 7

 Grashoff did not follow these requirements, nor did she
heed the repeated warnings. She checked “no” on each of
the 24 weekly forms when asked whether she had worked
that week. Moreover, she reported none of her YMCA
earnings during this period, despite certifying each time that
she had reported “any and all work[] [and] earnings … for
th[e] week” and that “all answers and information given …
[were] true and accurate.” Grashoff received a total of $8,952
in benefits from her 24 claims. That amount would have
been $6,123.25 had she complied with the law and truthfully
reported her YMCA income.
 The Department eventually discovered Grashoff’s failure
to disclose her earnings. After an investigation, the Depart-
ment notified her that she forfeited and owed repayment of
the full amount of $8,952 in benefits pursuant to sec-
tion 1.1(a). The Department tacked on $2,238 under sec-
tion 1.1(b), the provision authorizing a 25% penalty for first-
time knowing violations of the reporting requirement. That
brought the total sanction to $11,190.
 Grashoff requested an administrative review. An ALJ
agreed with the Department’s determination that Grashoff
had knowingly failed to report the income from her part-
time job. Specifically, the ALJ found that Grashoff was
“responsible for the falsely answered questions about her
earnings” and had “fail[ed] to truthfully answer a direct and
simple question about whether or not she was working.”
The ALJ thus affirmed Grashoff’s liability for “all benefits
received” and the “civil penalties assessed.” 3

3 Grashoff was not criminally charged.
8 No. 20-2739

 Grashoff did not seek further review under state law. She
instead sued in federal court seeking declaratory and injunc-
tive relief under § 1983. She alleged that the forfeiture and
penalty provisions in sections 1.1(a) and (b) violate the
Eighth Amendment’s Excessive Fines Clause—both facially
and as applied to her. (She no longer pursues her facial
challenge, so we say no more about it.)
 The case proceeded to cross-motions for summary judg-
ment, and the judge entered judgment for the Department.
She first held that section 1.1(a)—the forfeiture/repayment
provision—is remedial rather than punitive and thus
“avoids Eighth Amendment scrutiny.” She then turned to
the 25% penalty in section 1.1(b), which everyone agreed is a
punitive sanction. The judge held that a penalty of 25% of
the total forfeiture amount is not an excessive sanction for
knowing violations of the reporting requirement. To reach
that conclusion, the judge considered the factors outlined in
Bajakajian and found that each one weighed against
Grashoff.
 II. Analysis
 The Eighth Amendment prohibits the imposition of “ex-
cessive fines.” U.S. CONST. amend. VIII. The Excessive Fines
Clause applies to the states, see Timbs v. Indiana, 139 S. Ct.
682, 687 (2019), and we review de novo the judge’s determi-
nation that the sanction imposed here does not violate it, see
United States v. Bernitt, 392 F.3d 873, 880 (7th Cir. 2004) (citing
Bajakajian, 524 U.S. at 336); Towers v. City of Chicago, 173 F.3d
619, 625 (7th Cir. 1999).
 The analysis under the Excessive Fines Clause proceeds
in two steps. The first is a threshold determination: Is the
No. 20-2739 9

sanction punitive or purely remedial? Because the Eighth
Amendment “limits the government’s power to extract
payments … as punishment for some offense,” Austin v.
United States, 509 U.S. 602, 609–10 (1993) (quotation marks
omitted), only punitive sanctions fall within its scope; purely
remedial sanctions are not subject to Eighth Amendment
scrutiny, see Towers, 173 F.3d at 624.
 The inquiry does not depend on whether the sanction
arises in the civil or criminal context; “civil sanctions can
constitute punishment, and therefore are subject to the
limitations of the Excessive Fines Clause, if they serve, at
least in part, retributive or deterrent purposes.” Id.; see also
Pimentel v. City of Los Angeles, 974 F.3d 917, 921–22 (9th Cir.
2020) (explaining that the Ninth Circuit has applied the
Excessive Fines Clause to “civil penalties imposed by federal
law” and that Timbs “affirmatively opens the door for Eighth
Amendment challenges to fines imposed by state and local
authorities”).
 If the sanction is punitive, the next step is to determine
whether it is “grossly disproportional to the gravity of
[the] … offense.” Bajakajian, 524 U.S. at 334. “The touchstone
of the constitutional inquiry … is the principle of propor-
tionality: The amount of the [fine] must bear some relation-
ship to the gravity of the offense that it is designed to
punish.” Id. But proportionality review is conducted with
two important background principles in mind: “judgments
about the appropriate punishment for an offense belong in
the first instance to the legislature,” and judicial determina-
tions of the seriousness of any particular offense “will be
inherently imprecise.” Id. at 336.
10 No. 20-2739

 In Bajakajian the Supreme Court identified several factors
that may help guide the proportionality determination. Id. at
337–39. We have distilled the Court’s instructions into four
general areas of inquiry. The first looks to the “essence of the
[offense] and its relation to other criminal activity.” United
States v. Malewicka, 664 F.3d 1099, 1104 (7th Cir. 2011). The
second asks whether the sanctioned person “fit[s] into the
class of persons for whom the statute was principally de-
signed.” Id. The third considers the “maximum sentence and
fine that could have been imposed” for like conduct. Id. As
the Court explained in Bajakajian, legislative judgments
about maximum sentences and fines for comparable offenses
are “relevant evidence” when assessing the gravity of the
offense. 524 U.S. at 339 n.14. The final factor is “the nature of
the harm caused by the … conduct” that led to the sanction.
Malewicka, 664 F.3d at 1104.
 The Bajakajian factors come from a case about criminal
forfeiture—that is, a punishment tied to a conviction for a
crime—and most claims under the Excessive Fines Clause
arise in that context. See Pimentel, 974 F.3d at 921. But the
same basic framework applies here.
A. Punitive or Remedial?
 As we’ve noted, it’s undisputed that the 25% penalty un-
der section 1.1(b) is punitive; it punishes claimants who
knowingly fail to disclose their income. The parties also
agree that of the $8,952 in forfeited benefits that Grashoff
was ordered to repay, roughly $2,829—the amount that
would have been deducted from her benefit payments had
she reported her income as required—qualifies as a purely
remedial recoupment of a benefits overpayment. So that part
No. 20-2739 11

of the forfeiture raises no Eighth Amendment concerns.
Grashoff concedes as much. 4
 The parties disagree, however, on how to classify the bal-
ance of the forfeiture—the $6,123 in benefits that Grashoff
would have received if, counterfactually, she had disclosed
her YMCA income as required. The Department argues that
this part of the forfeiture also qualifies as remedial because a
claimant who knowingly fails to disclose income becomes
ineligible for any benefits for that week by operation of
section 1.1(a). In other words, Grashoff was not eligible to
receive a single dollar during each of the 24 weeks for which
she knowingly failed to report her YMCA earnings. On the
Department’s reasoning, the entire forfeiture is remedial
because it recoups all wrongfully obtained benefits.
 Grashoff sees things differently. She argues that a forfei-
ture of all benefits received is punitive because it strips her of
benefits to which she would have been entitled had she
complied with the law. That is, the Department would have
paid out a reduced benefit of $6,123 if she had disclosed her
income, so the only cost to the fund is the money she re-
ceived above that amount—the $2,829 that would have been
deducted based on her YMCA earnings. The rest of the
forfeiture, she argues, serves only to punish misconduct and
deter fraud.

4 Grashoff conceded this point in her opening brief. She tried to walk

back the concession in her reply brief by suggesting that the entire
forfeiture should be reviewed for excessiveness. That’s too late to raise
new arguments. See Wonsey v. City of Chicago, 940 F.3d 394, 398 (7th Cir.
2019) (“[A]rguments raised for the first time in a reply brief are
waived.”).
12 No. 20-2739

 There’s no need for us to resolve this dispute. Assuming
for the sake of argument that Grashoff is right about how to
draw the remedial/punitive line, the total sanction subject to
Eighth Amendment scrutiny is $8,361: the penalty imposed
under section 1.1(b) ($2,238) plus the portion of the total
section 1.1(a) forfeiture that Grashoff insists is punitive
($6,123). And as we will explain, that sanction—$8,361—is
not grossly disproportionate to Grashoff’s offense.
B. Proportionality Analysis
 The first Bajakajian factor—the “essence” of the underly-
ing offense and its relation to other unlawful activities—
weighs against Grashoff. Although the sanction at issue here
is civil rather than criminal, the underlying violation of the
law is significant. Grashoff knowingly failed to disclose her
income on 24 applications for public benefits, and each time
she falsely certified that she had reported her earnings and
given truthful answers on her applications. Put another way,
on 24 occasions Grashoff knowingly withheld information
about her income to obtain a higher benefit from a limited
fund meant to support economically vulnerable people in
Indiana. This case is far afield from Bajakajian, where the
essence of the offense—a single failure to report the trans-
portation of more than $10,000 outside the United States—
suggested that the forfeiture of over $357,000 was unconsti-
tutional. Bajakajian, 524 U.S. at 325, 337–38.
 Grashoff disagrees, characterizing her offense as a “single
administrative violation” that resulted from her mistaken
understanding of the reporting requirements. That flatly
contradicts the ALJ’s findings that Grashoff knowingly and
repeatedly violated the reporting requirement. Grashoff tries
to lump her 24 violations into one, but the “gravity of [her]
No. 20-2739 13

offenses does not diminish because [she] repeatedly commit-
ted the same offense.” Korangy v. FDA, 498 F.3d 272, 278 (4th
Cir. 2007). To the extent that Grashoff contends that she did
not knowingly fail to report her earnings, the ALJ found
otherwise. Grashoff did not seek judicial review of that
determination, and she cannot use federal excessive-fines
litigation to collaterally attack the ALJ’s factual findings.
 The second Bajakajian factor asks whether the sanctioned
person fits within the “class of persons for whom the statute
was principally designed.” Malewicka, 664 F.3d at 1104.
Grashoff clearly does. Section 22-4-13-1.1 generally protects
the integrity and viability of Indiana’s unemployment fund
by recouping improperly paid benefits and punishing
claimants who receive more than their proper share through
their own fraud. Grashoff suggests that the benefits scheme
is meant to help people like her, so applying § 22-4-13-1.1
against her is contrary to the overall statutory purpose. But
the general purpose of providing benefits to unemployed
people does not place Grashoff outside the intended scope of
§ 22-4-13-1.1, which is an antifraud provision that protects
the fund’s ability to pay benefits to legitimate claimants.
Grashoff repeatedly and knowingly failed to disclose income
that would have reduced her benefits, so she is squarely
within the class of persons for whom this statute was princi-
pally designed. See Bajakajian, 524 U.S. at 336 (“[J]udgments
about the appropriate punishment for an offense belong in
the first instance to the legislature.”).
 The third factor “considers the maximum fine and sen-
tence that could have been imposed.” Malewicka, 664 F.3d at
1106. Grashoff was not criminally prosecuted, so she con-
tends that it is improper to consider any criminal penalties
14 No. 20-2739

that might have been imposed. This argument misunder-
stands the relevance of this Bajakajian factor. The point is not
to suggest that Grashoff would have been convicted if she
had been criminally prosecuted. Rather, penalties for similar
conduct are relevant evidence of legislative judgments about
the seriousness of the offense. Bajakajian, 524 U.S. at 339 n.14.
 Indiana’s criminal penalties for conduct similar to
Grashoff’s demonstrate that the state takes this kind of
public-benefits fraud seriously. A person commits a class C
misdemeanor if he knowingly violates the statutes concern-
ing the unemployment-compensation system, and “[e]ach
day a violation continues constitutes a separate offense.”
§ 22-4-34-4. A class C misdemeanor is punishable by a fine of
up to $500 and imprisonment of up to 60 days, so stacking
these offenses could lead to significant criminal liability. IND.
CODE § 35-50-3-4. Further, at the time of Grashoff’s 24 viola-
tions, it was a level 6 felony to “knowingly … obtain[] public
relief or assistance by means of … [a] false or misleading oral
or written statement[] … or other fraudulent means” when
the public relief involved was over $750. Id. § 35-43-5-7(a)(1),
(b)(1) (repealed July 1, 2021). 5 Level 6 felonies carry a maxi-
mum prison term of 30 months and a fine of up to $10,000.
Id. § 35-50-2-7(b).
 Indiana is not alone in viewing unemployment fraud as a
serious offense. For example, Alaska penalizes unemploy-
ment-benefit claimants who knowingly make a material

5 As described supra note 2, the Indiana legislature repealed this provi-

sion while this case has been pending, but the state’s criminal laws still
proscribe and punish this kind of public-benefits fraud. See § 35-43-5-
4(a)(1), (b)(2).
No. 20-2739 15

false statement with the intent to defraud by rendering them
ineligible for benefits for the weeks in which they made the
false statements. ALASKA STAT. ANN. § 23.20.387. The claim-
ant is also disqualified from receiving benefits for between 6
and 52 weeks, id., and is liable for the benefits improperly
paid and a penalty of 50% of such benefits, id. § 23.20.390(a),
(f). If a Minnesota claimant receives an overpayment of
benefits by making a false statement or representation, he
must repay the money to which he was not entitled and pay
a 40% penalty on that amount. MINN. STAT. ANN. § 268.18,
subd. 1(a), subd. 2(a). He also may lose eligibility for unem-
ployment benefits for up to two years, id. § 268.183(a), and is
subject to criminal penalties of up to five years in prison and
a $10,000 fine if he obtains overpayments between $1,000
and $5,000 by “intentional concealment of a material fact,”
id. §§ 268.182, subd.1(a); 609.52, subd. 3(3)(a).
 In New Hampshire the knowing failure to disclose a ma-
terial fact to increase unemployment benefits by more than
$1,000 is a class A felony, which is punishable by up to
15 years in prison and a maximum fine of $4,000. N.H. REV.
STAT. ANN. §§ 282-A:161(I); 651:2(II)(a), (IV)(a). Additionally,
all benefits received for that week must be repaid, plus a
20% penalty. Id. § 282-A:163(II). A Colorado claimant who
receives an overpayment of unemployment benefits because
of his “false representation or willful failure to disclose a
material fact … shall pay … the overpayment plus a [65%]
monetary penalty.” COLO. REV. STAT. ANN. § 8-81-101(4)(a)(II).
And in Arizona each knowing failure to disclose a material
fact to increase unemployment benefits is a class 6 felony,
which carries up to a $150,000 fine and a maximum
18-month prison sentence. ARIZ. REV. STAT. ANN. §§ 23-785,
13-801, 13-702(D).
16 No. 20-2739

 These legislative judgments about punishments for un-
employment fraud provide clues about the nature and
gravity of Grashoff’s offense. Like other states, Indiana has
deemed unemployment fraud to be a serious offense. The
civil sanction imposed here reflects that judgment, which
“belong[s] in the first instance to the legislature.” See
Bajakajian, 524 U.S. at 336.
 The fourth factor directs us to consider the harm caused
by Grashoff’s conduct. Towers, 173 F.3d at 625; see also
Malewicka, 664 F.3d at 1104. Her knowing nondisclosures led
to monetary harm to the unemployment fund in the form of
overpaid unemployment benefits. If unchecked and unde-
terred, this conduct would threaten the viability of this
government-administered fund designed to help financially
vulnerable unemployed people in Indiana.
 Moreover, the harm from Grashoff’s conduct goes be-
yond the overpayment of benefits. See U.S. ex rel. Bunk v.
Gosselin World Wide Moving, N.V., 741 F.3d 390, 409 (4th Cir.
2013) (“For purposes of our Eighth Amendment analysis, …
the concept of harm need not be confined strictly to the
economic realm.”); Yates v. Pinellas Hematology & Oncology,
P.A., 21 F.4th 1288, 1316 (11th Cir. 2021) (“Fraud harms the
United States in ways untethered to the value of any ulti-
mate payment.”). Fraud like hers complicates the admin-
istration of the fund. The Department must spend time and
resources investigating fraud and, when detected, remedy-
ing it. Put differently, when some claimants don’t comply
with the baseline requirement to honestly report their in-
come, it becomes harder to administer the fund and compli-
cates the distribution of benefits to all claimants. See Yates,
21 F.4th at 1316 (“Fraud imposes costs … in the form of the
No. 20-2739 17

expense of the constant Treasury vigil [it] necessitate[s].”
(alterations in original) (quotation marks omitted)); United
States v. Aguasvivas-Castillo, 668 F.3d 7, 17 (1st Cir. 2012)
(considering this Bajakajian factor and noting that food-
stamp fraud “introduce[s] waste into the program”).
 Fraud also undermines the integrity of the fund and the
public’s faith in the state’s ability to administer it efficiently
and fairly. As other courts have noted when reviewing fines
imposed under the False Claims Act, fraud “erodes the
public confidence in the [g]overnment’s ability to manage”
the defrauded program. United States v. Eghbal, 548 F.3d 1281,
1285 (9th Cir. 2008); see also Gosselin World Wide Moving,
741 F.3d at 409 (noting that the “prevalence of defense
contractor scams … shakes the public’s faith in the govern-
ment’s competence”); Yates, 21 F.4th at 1316 (“[W]hen the
[government] is defrauded, [it] has been damaged to the
extent that such corruption causes a diminution of the
public’s confidence … .” (quotation marks omitted)). The
same is true when claimants defraud the state’s unemploy-
ment fund by underreporting income. These nonmonetary
harms, “although not readily quantifiable, [are] certainly real
and a legitimate subject of the [state’s] concern.” Towers,
173 F.3d at 625.
 In sum, all the Bajakajian factors weigh against Grashoff.
A sanction of $8,361 is not grossly disproportionate to the
gravity of the offense that triggered it—here, unemployment
fraud in the form of 24 knowing violations of the require-
ment to disclose income. Although the Excessive Fines
Clause provides a constitutional limit, deference to legisla-
tive judgments about appropriate punishments is one of the
guiding principles that the Supreme Court has identified. See
18 No. 20-2739

Bajakajian, 524 U.S. at 336, 339 n.14. In fixing the amount of
the sanction for this type of fraud, Indiana’s legislature “was
entitled to take into consideration that the [statutory penal-
ty] must perform a deterrent function.” Towers, 173 F.3d at
626; see also Disc. Inn, Inc. v. City of Chicago, 803 F.3d 317, 320
(7th Cir. 2015) (finding no Excessive Fines Clause violation
and noting that difficulties in detecting violations of the
ordinance justified a higher fine for deterrence purposes).
Additionally, the sanction increased in proportion to the
number of fraudulent applications Grashoff submitted; had
she committed less fraud and received fewer benefits for
which she was ineligible, she would owe the Department
less. The “articulable correlation” between the penalty and
the harm that was lacking in Bajakajian is present here. See
524 U.S. at 340–41.
 We recognize that $8,361 is not a small sum. But even if
Indiana could recoup overpayments and effectively deter
unemployment fraud with a lesser sanction, the Excessive
Fines Clause does not require the state legislature to adopt
an antifraud statute that penalizes claimants no more than
necessary. Because this sanction is not grossly dispropor-
tionate to the gravity of Grashoff’s offense, it is not unconsti-
tutionally excessive.
C. Consideration of Individual Financial Circumstances
 Grashoff also argues that the Eighth Amendment inquiry
must consider her personal financial circumstances—
essentially, her ability to pay. She contends that a sanction is
more likely to be excessive if the sanctioned person has
No. 20-2739 19

limited means with which to pay it. 6 Grashoff points to the
Clause’s historical roots in the Magna Carta, which “required
that economic sanctions … not be so large as to deprive [an
offender] of his livelihood.” Timbs, 139 S. Ct. at 687–88
(second alteration in original) (quotation marks omitted).
 The Supreme Court has declined to address whether the
sanctioned person’s financial condition is relevant to the
excessiveness inquiry. See id. at 688; Bajakajian, 524 U.S. at 340
n.15. So do we. Grashoff does not contest the Department’s
evidence that as of 2020, she had more than $500,000 in a
retirement account—including about $12,000 in “Cash,
Money Funds, [and] Bank Deposits”—and significant equity
in her home. At the same time, she had relatively few liabili-
ties: no credit-card balances, about $22,000 remaining on her
mortgage, and a $12,000 obligation to her mother. Even if her
personal circumstances are a relevant factor in the constitu-
tional analysis, she has the ability to pay this sanction.
 AFFIRMED

6 We note that even for courts that consider financial circumstances, it is

not clear that a person’s present ability to pay is relevant. See United
States v. Viloski, 814 F.3d 104, 112 (2d Cir. 2016) (noting that “asking
whether a forfeiture would destroy a defendant’s future livelihood is
different from considering as a discrete factor a defendant’s present
personal circumstances” because “hostility to livelihood-destroying fines
is deeply rooted in our constitutional tradition[] [but] consideration of
personal circumstances is not”); United States v. Fogg, 666 F.3d 13, 19 (1st
Cir. 2011) (describing the district court’s error in assessing whether the
defendant “had the means to satisfy the judgment” rather than inquiring
into whether his “post-incarceration livelihood would be imperiled by
the forfeiture”).