In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-2635

STOP ILLINOIS HEALTH CARE FRAUD, LLC,

*Plaintiff-Appellant,*

*v.*

ASIF SAYEED, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-9306 — **Sharon Johnson Coleman**, *Judge.*

ARGUED APRIL 8, 2020 — DECIDED APRIL 29, 2020

Before RIPPLE, BRENNAN, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Stop Illinois Health Care Fraud, LLC brought a *qui tam* lawsuit against Management Principles, Inc. and some of its associates as well as the Healthcare Consortium of Illinois, alleging that they had an illegal referral practice that violated the Anti-Kickback Statute and, by extension, the federal and state False Claims Acts. The MPI defendants proceeded to a bench trial. At the close of the plaintiff's case, the district court entered judgment for the

defendants, concluding that there was no evidence that MPI paid any renumeration with the intent to induce referrals. Stop Illinois Health Care Fraud appeals that judgment.

The trial evidence plainly showed that MPI made monthly payments to HCI in return for access to the non-profit's client records and then used that information to solicit clients. The defendants contend that the arrangement constitutes a kickback offered in exchange for a referral, and that the district court came to the contrary conclusion because it employed too narrow an understanding of a referral. Review of the district court's reasoning leaves us concerned that the court did not account for the evidence regarding MPI's solicitation of HCI clients, and we are unable to confirm that the court employed the proper definition of a proscribed referral. We therefore reverse and remand for further proceedings.

**I**

A

The Healthcare Consortium of Illinois, or HCI, was an organization that contracted with the Illinois Department of Aging to coordinate services for low-income seniors in an effort to keep them at home and out of nursing homes. HCI sometimes referred clients who needed in-home healthcare services to Vital Home & Healthcare, Inc. and Physician Care Services, S.C., two companies housed under the same umbrella entity, Management Principles, Inc. Also known by its acronym, MPI is owned and managed by Asif Sayeed. Stop Illinois Health Care Fraud, LLC—an entity whose name leaves few doubts about its mission—sued MPI, its two home healthcare companies, Sayeed, and HCI, alleging that they orchestrated an illegal patient referral scheme.

The plaintiff brought its claims under the federal False Claims Act and its Illinois analogue. In recognition of the limited resources available for the government to police violations on its own, both statutes allow enforcement to be outsourced to private parties, known as relators, who sue alleged wrongdoers on the government's behalf in exchange for a cut of the recovery. See 31 U.S.C. § 3730(b)(1), (d); 740 ILCS 175/4(b)(1), (d). We call this a *qui tam* action, which comes from an abbreviation of a Latin phrase meaning "who [*qui*] sues in this matter for the king as well as [*tam*] for himself." See *U.S. ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 368 (7th Cir. 2016). Stop Illinois Health Care Fraud sued in this matter for the United States and the State of Illinois. Though both governments had the ability to intervene and take the matter over for themselves, they declined to do so.

The operative complaint alleged that MPI and HCI had a contract and that MPI paid HCI gift cards in substantial amounts in return for the ability to access the detailed information that HCI employees gathered about clients during in-home assessments. Using that information, MPI called Medicare-eligible seniors and offered them the services of its two home healthcare companies. MPI's payments to HCI, the complaint alleged, ran afoul of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), which makes it illegal to pay someone to induce them to refer a patient for services that will be paid for by a federal healthcare program. The plaintiff sued under the federal and state False Claims Acts, which prohibit claims for payment on services resulting from violations of the Anti-Kickback Statute.

HCI settled the claims against it, but Sayeed and his companies proceeded to a bench trial. Ella Grays, who used to be

a supervisor at HCI, testified about her former employer's usual referral practices. She explained that the organization dispatched caseworkers to seniors' homes to assess whether they could safely remain living on their own and, if so, whether they needed additional services like meal deliveries or aides to assist with daily living. When a client needed in-home healthcare, the HCI caseworker would make a referral from a prepared list of providers. To ensure a fair distribution, HCI caseworkers rotated the referrals by methodically going down the list. MPI's companies received referrals in this manner, and Grays did not believe that any of the referrals were given in exchange for something of value.

The parties expended little trial time on the topic of gift cards. Grays testified she did not know of caseworkers ever receiving gift cards from anyone at MPI. The plaintiff presented the video testimony of Alice Piwowarski, a former MPI employee who said that she gave HCI caseworkers Dunkin' Donuts gift cards on special occasions like birthdays and charged them to her expense account. Sayeed confirmed that his employee handed out the small gift cards—in $5 or $10 amounts—as friendly birthday gifts but denied that the purpose was to receive referrals.

Most of the trial testimony focused instead on a 2010 Management Services Agreement under which MPI paid HCI $5,000 a month. What HCI was paying MPI to do was the topic of much discussion, since the contract itself was vague. HCI's only stated obligations were to "assist MPI in the management of the case management Program and appoint personnel as Associate Managers." For their part, HCI's associate managers had to "[d]evote sufficient time for the performance of all assigned duties" and "[p]rovide periodic written reports

of activities." The plaintiff's theory, as laid out in its opening statement, was that the ambiguous Management Services Agreement was a sham contract meant to disguise a kickback offered for patient referrals.

Sayeed testified that the idea for the agreement came about because HCI was in need of financial help and MPI was looking to become an Accountable Care Organization, which required enrolling 5,000 Medicare recipients as patients. Believing that MPI could not acquire that many patients on its own, Sayeed thought the company could rely on HCI records to find them—a process he referred to as "data mining." Sayeed explained that the executed agreement fulfilled this purpose by requiring HCI to do two things—give MPI access to the comprehensive forms that caseworkers filled out when they assessed clients and teach MPI about how it coordinated care. He also said that HCI's attorney not only had contributed to drafting the agreement but also approved of it.

MPI's acquiring access to HCI's caseworker paperwork was important because those documents included information about the clients' medical diagnoses, healthcare needs, and living situations. Sayeed clarified that before the Management Services Agreement took effect, MPI had access only to the assessment forms of clients who HCI had referred to its providers, but the agreement opened the door to those of all HCI's patients.

The trial testimony also shed light on how MPI acquired access and what its employees then did with the information gleaned from HCI's files. Sayeed testified that MPI employees would go to HCI's office and copy the information from caseworkers' forms to an intake tracking log and a client referral log. He explained that the data was helpful because MPI

could extract patterns from it to forecast future events, allowing for earlier intervention that was cheaper and more efficient. The purpose of collecting HCI clients' information, he said, was not to solicit them for home health services but rather to help HCI and to mine data.

But Sayeed's testimony showed that his companies did use the information obtained from HCI's files to solicit and acquire new patients. MPI would call individuals from the logs and, if the person did not have a doctor and was unable to travel to one, it would send a doctor from MPI's sister company Physicians Care Services to the client's house. Something similar occurred for seniors in need of in-home nursing. MPI used the HCI data to forecast when a client would need help and then call the person's doctor. If the doctor prescribed home assistance, MPI would send a nurse to evaluate the patient.

Rosetta Cutright Woods, a former MPI employee whose job it had been to go to HCI and retrieve their clients' information from the forms, confirmed that the solicitation process worked just this way. She testified that, upon arriving at HCI, she would access the caseworkers' files and then write down the clients' diagnoses and contact information. After returning to MPI, she would speak with the doctor who ran Physicians Care Services, and the doctor would review the list of HCI clients and instruct Woods who to call. Woods would then make the calls and asked the prospective clients if they needed additional medical assistance. If the person responded in the affirmative, Woods recorded the information and later relayed it to Physicians Care Services.

According to Sayeed, the Management Services Agreement also required HCI to teach MPI about the care

coordination work that it did, and HCI provided an employee who was available to MPI for questions. But Sayeed could not name the HCI liaison, and he admitted to never having seen a written report of the person's activities as was contemplated by the agreement. Ella Grays—the former HCI supervisor—testified that she could not think of a time any HCI employee ever did work for MPI under the agreement.

Indeed, Grays offered a different understanding of the Management Services Agreement. She testified that its purpose was for MPI to collect and analyze HCI's data in an effort to help HCI better understand their clients' needs and in doing so facilitate the organization's grant-writing process. She recalled that as part of the agreement, MPI would call HCI's clients to see if they needed additional services and, if so, they would make a referral that had to be approved by HCI's director.

The agreement remained in effect for 18 months, and MPI's payments to HCI totaled $90,000. Sayeed testified that MPI then ceased the payments, but HCI nevertheless continued to give the company access to its clients' information, which he attributed to the mutually beneficial nature of the arrangement.

Finally, John Mininno, the head of Stop Illinois Health Care Fraud, offered testimony about his company's relator practices and how the defendants and their practices came to his attention. But, unsurprisingly given his role in the litigation, Mininno had little firsthand information to offer on the topic of the Management Services Agreement's purpose and operation.

B

After the plaintiff's case concluded, the defendants moved for a directed verdict. They argued that the plaintiff had shown no impropriety in the HCI referrals as needed to meet its prima facie burden, both failing to substantiate the complaint's allegations about using gift cards as bribes and presenting no evidence that the parties intended the Management Services Agreement to enable and facilitate referrals from HCI to MPI and its sister companies. The district court held oral argument on the motion, where the plaintiff put forth a different view of the evidence. Pointing to Woods's testimony about collecting client information from HCI's files and then using it to place solicitation calls, the plaintiff explained that the defendants used the agreement "to get referrals for essentially any patients that they wanted by having HCI open their files and allowing them, rather than getting a referral from an HCI case manager directly, to call those individuals up."

The following day the district court issued a brief written order finding that the plaintiff had fallen short of its burden. Because the trial had been before a judge and not a jury, the court construed the defendants' motion for a directed verdict as one for judgment on partial findings under Federal Rule of Civil Procedure 52(c). The court's factual findings touched lightly on the topic of the Management Services Agreement, noting that it provided for MPI to pay HCI $5,000 per month in exchange for "administrative advice and counsel"; that Sayeed discussed his "data mining" objectives with HCI's lawyer, who gave his blessing; and that, even though John Mininno testified that the payments under the agreement constituted a kickback, he had not specifically explained why.

The district court's legal conclusions were succinct. While acknowledging the undisputed evidence that an MPI employee gave low-value gift cards to a few HCI caseworkers and that the Management Services Agreement existed, the court found no evidence that either was intended to induce patient referrals. The evidence, the court continued, compelled the contrary conclusion. Sayeed testified that the payments his company made under the agreement were unaccompanied by any expectation of referrals, HCI's lawyer had signed off on the contract, and other witnesses denied knowledge that the defendants had given anything of value in return for referrals. On that basis, the district court granted the defendants' motion and entered judgment in their favor on all counts. The plaintiff now appeals.

## II

Rule 52(c) provides for judgment based on partial findings, the bench trial equivalent of its more well-known cousin, a motion for judgment as a matter of law (or a directed verdict) under Rule 50(a). Both rules allow the trial court to resolve an issue after a party has been fully heard but before the trial has concluded. See FED. R. CIV. P. 50(a), 52(c). But Rule 50(a) applies to jury trials, and Rule 52(c) applies to bench trials. The other crucial difference between the two is that a district court resolving a Rule 50(a) motion must consider the evidence in the light most favorable to the non-moving party to avoid usurping the jury's role as factfinder, but there is no such concern in a bench trial, so under Rule 52(c) the court can weigh evidence, determine witness credibility, and make factual findings on the way to its legal conclusions. See *Wilborn v. Ealey*, 881 F.3d 998, 1008 (7th Cir. 2018). The court's findings of fact and conclusions of law must comply with Rule 52(a)'s

requirement that the court "find the facts specially and state its conclusions of law separately." See FED. R. CIV. P. 52(c).

Recognizing that the district court is in the better position to determine facts, we defer to its factual findings unless there is a clear error. See *Fillmore v. Page*, 358 F.3d 496, 503 (7th Cir. 2004). But the court's legal conclusions are not entitled to that deference and we review them *de novo*. See *id.*; 9A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2573.1 (3d ed.) (explaining that a Rule 52(c) judgment "is reversible only if the appellate court finds it to be clearly erroneous, even though the underlying conclusions of law are reviewed de novo").

## A

The plaintiff's claims arose under the False Claims Act, but they hinged on whether the defendants violated the Anti-Kickback Statute. See 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]."); see also *New York v. Amgen Inc.*, 652 F.3d 103, 113 (1st Cir. 2011) (concluding the same is true of the Illinois False Claims Act). Section 1320a-7b(b)(2)(A) of the Anti-Kickback Statute makes it unlawful (indeed a felony) to knowingly and willfully offer or pay a renumeration to someone in order to induce that person to "refer" an individual for a service for which payment may be made under a federal healthcare program.

The district court broadly concluded that the plaintiff offered "no evidence" that the gift cards or Management Services Agreement were intended to induce referrals. That is certainly true as to the gift cards. The agreement, however,

presents a more difficult issue. No doubt nothing linked the monthly payments to HCI caseworkers telling their clients that they should use MPI's services. But the plaintiff put forward another, less direct theory—that MPI's payments under the agreement were intended to secure access to the client information in the HCI files that it then used to place solicitation calls. The question is whether this arrangement could constitute a prohibited referral under the Anti-Kickback Statute.

We expounded on what it means to "refer" a patient in *United States v. Patel*, 778 F.3d 607 (7th Cir. 2015). Dr. Kamal Patel prescribed home healthcare for some of his patients, and he was convicted of violating the Anti-Kickback Statute for accepting undisclosed payments from Grand Home Health Care. See *id*. at 609, 611. The evidence showed that Dr. Patel did not expressly direct his patients to Grand but instead allowed them to choose from among a stack of brochures for an assortment of home healthcare options. See *id*. at 610–11. To receive Medicare reimbursement for a patient who had selected Grand, the provider had to submit certification and recertification forms signed by a doctor to demonstrate that home care was medically necessary. See *id*. at 610. The government presented evidence that Grand and Dr. Patel had monthly meetings at which he signed certification forms and accepted cash payments. See *id*. at 611.

On appeal Dr. Patel argued that since his patients selected Grand on their own initiative, he could not be said to have referred them at all, let alone in exchange for payment. He urged us to construe Congress's use of "refer" in the Anti-Kickback Statute in a limited way—as meaning "to personally recommend to a patient that he seek care from a particular entity." *Id*. at 612.

We rejected that narrow definition of a referral in favor of a "more expansive" one that includes "a doctor's authorization to receive medical care." *Id*. at 613. Under that definition, Dr. Patel had referred patients to the healthcare provider that paid him, Grand Home Health Care, because he signed the mandatory certification forms necessary for the patients to receive Medicare-reimbursed home care. See *id*. at 614. The central characteristic of the referral, we explained, was that the doctor "facilitate[d] or authorize[d]" the patient's choice of provider. *Id*. A doctor stands between the patient and his chosen provider because his approval is necessary to obtain the services, and "[e]xercising this gatekeeping role is one way that doctors refer their patients to a specific provider." *Id*. In so concluding, we observed that our holding was consistent with Congress's broad objectives in the Anti-Kickback Statute of preventing Medicare and Medicaid fraud and protecting patient choice. See *id*. at 615.

*Patel*'s holding that a physician "refers" patients to a home healthcare provider when he approves them for services does not directly control this case, which concerns not a gatekeeping doctor but an organization (here, HCI) with no certification authority. The applicable lesson is instead that the definition of a referral under the Anti-Kickback Statute is broad, encapsulating both direct and indirect means of connecting a patient with a provider. It goes beyond explicit recommendations to include more subtle arrangements. And the inquiry is a practical one that focuses on substance, not form.

B

The district court was required to employ this inclusive understanding of a referral when evaluating whether the plaintiff had proven an illegal kickback scheme. The breadth

of the definition was particularly vital to the plaintiff's theory that MPI's payments to HCI under the Management Services Agreement constituted kickbacks intended to obtain referrals in the form of receiving access to the HCI files that the defendants then exploited to solicit clients. A factfinder applying an erroneously narrow understanding of a referral might find those facts, devoid of an explicit direction of a patient to a provider, to fall outside its scope. But application of the proper standard—the more inclusive, practical approach illustrated in *Patel*—presents a much closer question.

We cannot tell with any certainty which route the district court took. The opinion contains no express articulation of what constitutes a referral for the purposes of the Anti-Kickback Statute. And the fact that some material evidence makes no appearance in the factual findings causes us to question whether the court applied the broader definition intended by Congress and underscored in our prior opinion in *Patel*. We have observed before that although "the district court cannot be expected to explain the significance of every bit of evidence in the record," the failure to address material and potentially dispositive evidence "violates the command of Rule 52(a) to 'find the facts specially' and precludes effective appellate review." *Mozee v. Jeffboat, Inc.*, 746 F.2d 365, 370 (7th Cir. 1984); see also *Schneiderman v. United States*, 320 U.S. 118, 129–30 (1943) ("The pertinent findings of fact on these points . . . are but the most general conclusions of ultimate fact. It is impossible to tell from them upon what underlying facts the court relied, and whether proper statutory standards were observed.").

The district court's opinion contains no mention of the evidence showing that MPI used its access to HCI's files to solicit

and obtain patients, though the testimony on that point was considerable and unambiguous. Rosetta Cutright Woods explained with specificity how she was employed by MPI to go to HCI, copy down the medical and contact information from client files, and then contact those people to see if they needed medical care. If someone said they did, then Woods relayed the information to Physicians Care Services. Sayeed confirmed that his companies used the information in that manner. A practical analysis of this arrangement would allow, but perhaps not compel, a finding that it qualifies as a referral. Though no evidence suggested that HCI directed its clients to MPI or its home healthcare companies, one could conclude that the effect of the file access was the same. Instead of giving its clients MPI's name, the reasoning would go, HCI simply gave MPI its clients' names and the information needed to contact them.

But it seems the district court rejected this file-access theory of referral. We come to that view from the court's statement that the plaintiff presented "no evidence" that the Management Services Agreement was intended to induce referrals. The broad statement could mean one of two things with respect to the file access—either the court concluded that the so-called "data mining" did not constitute a referral under the Anti-Kickback Statute or that it was not the intent of the agreement. The court must have meant the former, because the plaintiff did present some evidence that the agreement was intended to give MPI access to HCI's files so that it could place solicitation calls. For example, Sayeed testified that the agreement's purpose was to mine data, and Woods's testimony about her collection of HCI's "data" and what she did with it (solicit clients) allowed a finding that MPI's intent to mine

data was synonymous with an intent to use the information to reach HCI's clients.

In the end, we are left with uncertainty. The district court did not acknowledge any of the evidence supporting the file-access theory of referral, and we cannot discern why it was rejected. The court may have applied the correct definition of "refer" but found that the proof fell short of it, or it may have instead committed a legal error by adopting an unduly narrow understanding of the term. In the absence of more explanation of the court's reasoning, we are unable to tell. The proper course in these circumstances—where the district court "made the necessary ultimate finding" that the Management Services Agreement was not intended to induce referrals but "failed to make the subsidiary findings necessary for us to follow its chain of reasoning"—is to remand for additional proceedings. *Mozee*, 746 F.2d at 370.

*       *       *

We VACATE the judgment and remand the case for further proceedings. We leave it to the district court to decide whether to reach new findings of fact and conclusions of law on the existing record or to reopen the record and receive additional evidence.