In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 22-3295 and 23-1943

STOP ILLINOIS HEALTH CARE FRAUD, LLC,

*Plaintiff-Appellee,*

*v.*

ASIF SAYEED, *et al.,*

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-09306 — **Sharon Johnson Coleman**, *Judge.*

_____

ARGUED JANUARY 18, 2024 — DECIDED MAY 2, 2024

_____

Before RIPPLE, BRENNAN, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* This case returns to us from
remand after the district court found the defendants—Asif
Sayeed and three associated healthcare companies—liable for
violating the Anti-Kickback Statute and False Claims Act to
the tune of nearly $6 million. The defendants appeal both the
liability and damages findings, raising several arguments. We
reject all but one, concluding that Sayeed and his companies
knowingly violated the False Claims Act without the

protection of a regulatory safe harbor, that the $6 million judgment is not constitutionally excessive under the Eighth Amendment, but that the district court nonetheless erred by calculating damages based on Medicare claims that may or may not have been related to the defendants' kickback scheme. So we affirm the judgment of liability but reverse in part to permit the district court to clarify which Medicare claims, all or some, resulted from the defendants' illegal kickback scheme.

## I

### A

Because our prior opinion described the background of this dispute in substantial detail, only a summary is necessary here. See *Stop Illinois Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743 (7th Cir. 2020).

Asif Sayeed wholly owns a healthcare management company called Management Principles, Inc., or MPI. That company manages two smaller ones—Vital Home & Healthcare and Physician Care Services—that provide home-based medical services to Medicare recipients in Illinois.

Sayeed's companies received a significant amount of their business from the Healthcare Consortium of Illinois. The Consortium was a non-governmental organization that contracted with the Illinois Department of Aging in the 2010s to help coordinate healthcare for low-income seniors. Each week it sent case managers to seniors' homes, asked questions about their health, and recorded their answers on comprehensive questionnaires. The Consortium then evaluated the questionnaires to identify seniors who needed in-home healthcare services and referred them to local providers.

The Healthcare Consortium maintained a list of approved partner organizations, and it made referrals from that list on a rotational basis. Upon identifying a medical need requiring outside assistance, the Consortium referred the case to the next provider on its list. This approach ensured that no partner received more referrals than others. Vital and Physician Care were on the Consortium's provider list.

In December 2010 Sayeed devised a scheme to bypass the Consortium's referral process by directly soliciting its clients for additional services. That same month his company MPI signed a Management Services Agreement with the Consortium. On paper, MPI agreed to pay the Consortium $5,000 monthly in exchange for what the arrangement called "management services" and "administrative advice and counsel." In practice, those terms concealed a different purpose.

Starting in 2010 the Healthcare Consortium gave MPI full access to its clients' healthcare data. Two or three times each week, MPI employees visited the Consortium, reviewed its questionnaire forms, and recorded seniors' contact and medical information. MPI then used that information both to identify and directly solicit Medicare-eligible seniors who might want or need additional healthcare services. If any seniors agreed, MPI forwarded their cases to Vital or Physician Care, which treated them, billed Medicare, and split the fee with MPI.

In exchange for this data access, MPI paid the Consortium $90,000 over 18 months. The payments stopped sometime around May 2012, but MPI nonetheless continued to mine the Consortium's records for potential solicitation opportunities. From December 2010 to June 2015, Vital and Physician Care

billed the federal government over $700,000 for services provided to the Consortium's clients.

B

In November 2012 a watchdog organization called Stop Illinois Healthcare Fraud sued Sayeed, MPI, Vital, and Physician Care in federal court in Chicago. It alleged that Sayeed and his companies violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, by paying the Consortium with the intent to induce referrals for medical services. By extension, the organization also alleged that the defendants violated the federal False Claims Act, 31 U.S.C. § 3729, when they requested payments from Medicare for services stemming from an unlawful referral arrangement.

The district court held a bench trial in July 2019. At the close of the plaintiff's case, the court entered judgment in favor of the defendants under Federal Rule of Civil Procedure 52(c). The court found that Sayeed and his companies had not violated the Anti-Kickback Statute or False Claims Act because they had paid the Consortium with the intent to obtain information, not patient referrals.

The plaintiff appealed, challenging the district court's interpretation of a "referral" as unduly narrow. We agreed, concluding that Congress's "definition of a referral under the Anti-Kickback Statute is broad, encapsulating both direct and indirect means of connecting a patient with a provider." 957 F.3d at 750. We also observed that the defendants' conduct—paying to access medical records that it used to solicit new clients—qualified as a form of indirect referral giving rise to an unlawful kickback scheme. So we reversed and remanded

for the district court to determine if the evidence supported such a file-access theory of referral.

## C

On remand the district court denied the defendants' renewed motion for a directed verdict. The court then held a second bench trial, during which it received new exhibits and heard additional testimony from Sayeed.

Trial concluded with the district court finding the defendants liable under both the Anti-Kickback Statute and False Claims Act. Applying the legal standards articulated in our prior opinion, the court concluded that Sayeed had paid the Consortium with the intent to induce referrals in the form of patient records and had made false representations to the government by billing Medicare for resulting services. The court imposed $5,940,972.16 in damages, which it calculated by trebling the value of the Medicare claims it deemed false and then adding a per-claim penalty of $5,500. See 31 U.S.C. § 3729(a)(1).

The defendants now appeal, challenging both the damages award and the underlying finding of liability.

## II

The Anti-Kickback Statute prohibits "knowingly and willfully offer[ing] or pay[ing] any remuneration … to any person to induce such person [] to refer an individual" for a federally reimbursable healthcare service. 42 U.S.C. § 1320a-7b(b)(2). Put most plainly, no one may pay another with the intent to receive a medical referral in return. See *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 182 (2016); see also *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011)

(holding that the intent to induce a referral may be one of multiple motives).

A medical provider that bills the federal government for services performed on unlawfully referred patients may also be liable under the False Claims Act. Indeed, for its part, the FCA imposes civil liability on "any person who … knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Courts have long recognized that claims for payment submitted to Medicare and Medicaid can be "false or fraudulent" within the meaning of the FCA if the claimant violated material laws or regulations when providing the underlying services. See *Escobar*, 579 U.S. at 182 (holding that when a Medicaid claimant "omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for [FCA] liability if they render the defendant's representations misleading"); see also *United States ex rel. Gross v. AIDS Rsch. All.-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005).

In 2010 Congress amended the Anti-Kickback Statute to make this connection explicit: "[A] claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

## A

The defendants contest the district court's finding that they "knowingly and willfully" sought to entice the Consortium to provide referrals—a required element of anti-kickback liability. See 42 U.S.C. § 1320a-7b(b)(2). They insist that the district court improperly evaluated Sayeed's state of mind based on what he objectively must have

believed rather than what he actually thought. That approach, the defendants press, violates the longstanding principle that FCA liability turns on a defendant's subjective intent—a principle the Supreme Court most recently acknowledged in *United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391 (2023).

The defendants misread the district court's finding. The court found that Sayeed "knowingly and willfully induced HCI to provide referrals … in exchange for a $5,000 monthly fee." To arrive at that determination, the court did not limit itself to what an objectively reasonable person in Sayeed's position might have believed. To the contrary, the district court took care to ground its analysis in Sayeed's subjective mental state, pointing to portions of his trial testimony where he explained his intent to mine the Consortium's client healthcare data for solicitation opportunities.

Nothing about the district court's analysis conflicts with *Schutte*. The Supreme Court in *Schutte* neither heightened nor altered the FCA's requirement that a defendant must subjectively know a claim to be false. The Court simply held that a defendant who harbors such a subjective belief cannot avoid liability by arguing that reasonable minds might disagree. See 143 S. Ct. at 1395. That holding does not help Sayeed. Indeed, it makes it harder—not easier—for him to avoid FCA liability. The defendants' reliance on *Schutte* is misplaced.

At its bottom, then, Sayeed's argument amounts to nothing more than a plea to relitigate the question of intent. We decline the invitation. Fraudulent intent is a factual finding subject to reversal only if we are "left with the definite and firm conviction that a mistake has been committed." *Freeland v. Enodis Corp.*, 540 F.3d 721, 733 (7th Cir. 2008) (quoting

*Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). Our review of the record belies any such conviction. Sayeed testified at trial that he had spent over three decades in the healthcare industry and knew full well that it was "illegal to buy protected health information." The district court committed no error in finding that he and the other defendants knowingly and willfully violated the Anti-Kickback Statute and, by extension, the False Claims Act.

B

Sayeed next asks us to reverse the liability finding because his conduct qualified for a regulatory safe harbor in 42 C.F.R. § 1001.952(d). That provision establishes that payments made pursuant to certain types of personal-services and management contracts do not violate the Anti-Kickback Statute. Sayeed contends that MPI's contract with the Consortium falls within that safe harbor and therefore cannot form the basis for his liability. We disagree.

Under § 1001.952(d), a contract must satisfy six requirements to qualify for the protection of the safe harbor. We need not catalog each because MPI's contract with the Consortium unquestionably fails the second requirement: any qualifying contract must "cover[] all of the services the agent provides to the principal for the term of the agreement and specif[y] the services to be provided." *Id.* § 1001.952(d)(1)(ii).

The defendants' agreement neither "covered" nor "specified" all the services that the Consortium provided to MPI. Sayeed explicitly acknowledged as much during his trial testimony, stating that his agreement with the Consortium permitted MPI to access its medical records and directly solicit clients. The written contract made no reference to such data

mining or client solicitation, rendering it ineligible for safe-harbor protection under § 1001.952(d).

We affirm the district court's finding of liability as to all defendants.

## III

The defendants separately challenge the district court's damages award, arguing that it is constitutionally excessive under the Eighth Amendment and improperly divorced from the actual loss incurred by the government. We address each argument in turn, after first outlining the statutory basis for the district court's damages calculation.

## A

The False Claims Act requires violators to pay three times the total loss sustained by the government "because of" their false claim(s). 31 U.S.C. § 3729(a)(1). The FCA further imposes a civil penalty between $5,000 and $10,000 for each claim, adjusted for inflation. See *id.*; see also *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 769 (2000) (stating that the penalty applies to each discrete payment claim submitted in the course of a fraud scheme). Given the date of Sayeed's offense conduct, his inflation-adjusted penalty range was $5,500–$11,000. See 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(13).

The district court approached the damages analysis by first determining the number and amount of false claims that the defendants submitted to the government. To do so, it relied heavily on a spreadsheet that listed 673 requests for Medicare payment submitted by the defendants Vital and Physician Care between December 13, 2010 and June 3, 2015. The defendants produced this spreadsheet—referred to as

Plaintiff's Exhibit 9 at trial—in response to an interrogatory that asked for a full breakdown of the Medicare claims they submitted for services provided to clients of the Consortium.

The district court found that every claim included on the plaintiff's spreadsheet was false, reasoning that each was submitted after the date on which MPI began mining Consortium data. It then tripled the total claim amounts listed on the spreadsheet and applied the minimum $5,500 per-claim penalty required under the FCA. That led the court to impose $3,174,821.58, jointly and severally, against Sayeed, MPI, and Vital—and $2,766,150.58, jointly and severally, against Sayeed, MPI, and Physician Care.

B

The defendants attack the nearly $6 million judgment as unconstitutionally excessive under the Eighth Amendment. We view it differently.

The Excessive Fines Clause of the Eighth Amendment "limits the government's power to extract payments … as punishment for some offense." *Austin v. United States*, 509 U.S. 602, 609–10 (1993) (cleaned up). "[C]ivil sanctions can constitute punishment, and therefore are subject to the limitations of the Excessive Fines Clause, if they serve, at least in part, retributive or deterrent purposes." *Towers v. City of Chicago*, 173 F.3d 619, 624 (7th Cir. 1999) (citing *Austin*, 509 U.S. at 610). "[P]urely remedial sanctions are not subject to Eighth Amendment scrutiny." *Grashoff v. Adams*, 65 F.4th 910, 916 (7th Cir. 2023).

Our court has not resolved whether the Eighth Amendment applies to civil penalties under the FCA. In *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008), we voiced skepticism,

observing that punitive damages—to which the FCA's trebling provision is often compared—are not "fines" under the Eighth Amendment and that FCA liability does not constitute criminal punishment for purposes of the Double Jeopardy Clause. *Id.* at 453–54 (citing *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257 (1989) and *Hudson v. United States*, 522 U.S. 93 (1997)).

This case does not require us to resolve whether a civil damages award under the FCA constitutes "punishment" within the meaning of the Eighth Amendment. Even if we reached that issue and agreed with the defendants, the fines levied against them would not be unconstitutionally excessive.

To violate the Excessive Fines Clause, a penalty must be "grossly disproportional to the gravity of the defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). In evaluating proportionality, we focus on four factors:

> (1) the essence of the offense and its relation to other criminal activity; (2) whether the defendant fit into the class of persons for whom the statute was principally designed; (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the defendant's conduct.

*United States v. Malewicka*, 664 F.3d 1099, 1104 (7th Cir. 2011) (citing *Bajakajian*, 524 U.S. at 337–39).

The $6 million judgment entered by the district court easily satisfies the proportionality test. Sayeed and his companies defrauded the federal government for years, seizing a disproportionate share of Medicare funds by concealing

unlawful kickbacks. See *Malewicka*, 664 F.3d at 1104 (emphasizing that a fraud scheme was "extensive" and "required significant planning" when upholding a damages award under the Excessive Fines Clause). In doing so, the defendants extracted undue gains from the Medicare program, required the government to "spend time and resources investigating [the] fraud," and "undermine[d] the integrity of the fund and the public's faith in the state's ability to administer it efficiently and fairly." *Grashoff*, 65 F.4th at 920. Their conduct differed sharply from that in *Bajakajian*, where the Supreme Court reversed a fine as unconstitutionally excessive because "[t]here was no fraud on the United States" or "loss to the public fisc." 524 U.S. at 339.

By any measure, Sayeed's actions "affected more than just [him]self and the government." *Malewicka*, 664 F.3d at 1104. The defendants accessed the private health information of hundreds of vulnerable seniors in Illinois without their permission and exploited their records for profit through unsolicited marketing calls. These harms, which are not explicitly captured in the FCA's loss calculation, further support the district court's damages award. By no means was this victimless fraud.

The challenged fine, while high in absolute terms, also falls squarely within the boundaries set by Congress. Decisions "about the appropriate punishment for an offense belong in the first instance to the legislature." *Bajakajian*, 524 U.S. at 336. Indeed, the law recognizes "a strong presumption of constitutionality where the value of a forfeiture falls within the fine range prescribed by Congress." *Malewicka*, 664 F.3d at 1106. Such a range "reflect[s] the considered legislative

judgment as to what is excessive, and a court should be hesitant to substitute its opinion for that of the people." *Id.*

The district court respected Congress's assessment of the severity of the defendants' offense conduct by faithfully applying the damages formula in 31 U.S.C. § 3729(a). In fact, $6 million reflected the lowest amount permitted under the FCA, given the number and amount of false claims that the district court found that the defendants submitted to the Medicare program. The court ultimately decided to impose the lowest per-claim penalty available under the statute, even though the FCA permitted up to double that amount.

Put more bluntly, the defendants could have fared much worse given the seriousness and persistence of their fraudulent scheme. In *Bajakajian*, the Supreme Court emphasized that the defendant's false claims were "unrelated to any other crime" and described that fact as "highly relevant to the determination of the gravity of [his] offense." 524 U.S. at 337 n.12. Not so here. At the time of Sayeed's offense, the Anti-Kickback Statute imposed both civil fines and criminal sentences—up to five years' incarceration and potential permanent exclusion from federal healthcare programs. See 42 U.S.C. §§ 1320a-7(b)(7), 1320a-7b (2003). Though the defendants never faced a federal indictment, the criminal sanctions available for their conduct provide "relevant evidence of legislative judgments about the seriousness of the offense" that inform our Eighth Amendment analysis. See *Grashoff*, 65 F.4th at 919. Given the gravity of the defendants' kickback scheme—as reflected by Congress's decision to prescribe criminal penalties for such conduct—we do not consider the district court's damages award to be constitutionally excessive.

C

Next comes defendants' narrower challenge to the amount of damages. Setting constitutional considerations aside, they argue that the district court erred by characterizing the government's loss as the sum of all Medicare claims included in the plaintiffs' loss spreadsheet—whether or not the claims actually resulted from their illegal kickback scheme. On appeal the defendants insist that the Consortium continued to lawfully refer patients to MPI while the company mined its data—and that some of the claims on that spreadsheet (Exhibit 9 at trial)—derived from those lawful referrals. During oral argument, counsel for the defendants even went so far as to claim that *every* claim included on Exhibit 9 derives from a standard referral rather than from data mining. If either proposition is true, then the district court's loss calculation would be overinclusive.

Recall that the Anti-Kickback Statute provides that "a claim that includes items or services *resulting from* a violation of this section constitutes a false or fraudulent claim" for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g) (emphasis added). The phrase "resulting from" requires that there be some causal nexus between the allegedly false claims and the underlying kickback violation. It is not enough to show that a defendant both engaged in unlawful kickbacks and submitted false claims. The latter must "result[] from" the former. This means that, at a minimum, every claim that forms the basis of FCA liability must be false *by virtue of* the fact that the claims are for services that were referred in violation of the Anti-Kickback Statute.

Courts have articulated this causation requirement in different terms. The Sixth Circuit, for instance, has interpreted

§ 1320a-7b(g) to require but-for causality—a showing that a defendant would not have submitted a payment claim had he not engaged in an unlawful kickback. See *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1054–55 (6th Cir. 2023). The Third Circuit, on the other hand, has adopted a more permissive reading, concluding that a plaintiff need only demonstrate that a defendant "sought reimbursement for medical care that was provided in violation of the Anti-Kickback Statute." See *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 98 (3d Cir. 2018); see also *United States ex rel. Kester v. Novartis Pharmas. Corp.*, 41 F. Supp. 3d 323, 332–35 (S.D.N.Y. 2014) (rejecting the but-for causation standard).

This case does not require us to determine whether § 1320a-7b(g) requires a showing of but-for causality or something less. If Sayeed and his companies provided services to clients of the Consortium after MPI signed the data-mining agreement—and if the Consortium never referred those clients to the defendants through its standard rotational system—then even the strictest causal test would be satisfied. Any such services would necessarily result from the kickback scheme because, without mining the Consortium's data, the defendants would not have provided services to those patients. If, on the other hand, the defendants provided services to patients that the Consortium assigned to the defendants through its ordinary-course referral process, then Medicare claims for those services would bear no causal connection to the data-mining scheme.

All that remains, then, is whether the Consortium officially assigned any of the patients who appear on the loss spreadsheet to Vital or Physician Care through its standard rotational-referral process.

Our review of the district court's explanation for its damages award leaves us uncertain regarding which, if any, of the patients included on the loss spreadsheet were rotationally referred to the defendants. The district court approached the damages question more broadly by concluding that *all* Medicare claims submitted by the defendants for services provided to Consortium clients after December 1, 2010 (the effective date of the data-mining agreement) were necessarily false —regardless of whether they resulted from rotational referrals. The district court stated that "even *if* some referrals stemmed from the ordinary referral process … every claim submitted to the government after defendants began providing [the Consortium] with payments violated the False Claims Act" because "MPI had a unique relationship with [the Consortium] that pervaded every referral sent." That broad suggestion—that every claim for payment following an anti-kickback violation is automatically false regardless of its origin—is inconsistent with § 1320a-7b(g)'s directive that a false claim must "result[] from" an unlawful kickback.

In the final analysis, the record before us shows that the district court took great care in post-remand proceedings to ensure that it reached a liability finding consistent with the broad scope of referrals prohibited by the Anti-Kickback Statute. But we are not able to determine with confidence whether any of the services represented in the plaintiff's loss spreadsheet were provided to patients lawfully referred to the defendants by the Consortium. We therefore cannot be confident that Sayeed's challenge to the $6 million judgment lacks merit. Our only choice in these circumstances is to return the case to the district court.

**IV**

For these reasons, we AFFIRM in part and VACATE in part, issuing a limited remand solely as to the question of which claims, if any, on the loss spreadsheet (Exhibit 9) were for services provided to patients that the Consortium officially referred to either Vital or Physician Care through its standard rotational-referral system. Any such claims—and only such claims—must be excluded from the spreadsheet when calculating the damages sustained by the government under 31 U.S.C. § 3729(a)(1).